UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

| | | |
|---|---|---|
| DERRICK CAIN, #256881, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:07-cv-543 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| MDOC, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

This is a civil action brought *pro se* by a state prisoner pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-2(a), for alleged violations of his right to practice his religion.  Plaintiff is currently an inmate at the Baraga Maximum Correctional Facility (AMF) located in Baraga, Michigan.  At present, plaintiff identifies his faith as Neterian.  Before March of 2003, plaintiff had declared that he was a Sunni Muslim.

The matter is now before me on cross-motions for summary judgment on plaintiff's amended complaint.  (docket #'s 2, 54).  For the reasons set forth herein, I recommend that plaintiff's motion be denied.  I further recommend that defendants' motion for summary judgment be granted on all plaintiff's federal claims, with the exception of plaintiff's claims against defendant Burnett based on plaintiff's request that he be allowed to possess four items of personal property (a necklace of chant/meditation beads, an ankh symbol, incense, and a meditation rug, mat or blanket).  The claims against defendant Burnett regarding these four items, however, should be dismissed without

prejudice because they are not yet ripe for judicial review. I further recommend that plaintiff's claims against unserved defendants Jones and Snyder be dismissed pursuant to 28 U.S.C. § 1915A for failure to state a claim. Finally, I recommend that the court, in its discretion, decline to exercise supplemental jurisdiction over plaintiff's purported state-law claims.

## Plaintiff's Claims

Plaintiff alleges that he is a "believer, follower and practitioner of the Shetaut Neterian (ancient African) religion," and that he "reverted" from Islam to this religion in late 2002. (docket # 34, ¶ 11). In March of 2003, plaintiff filed a Change of Religious Preference form stating that plaintiff was "An Ausarian who teaches and practices Islam as a rite only." Plaintiff's claims generally relate to alleged deficiencies in the meals he has been served at various Michigan prisons since March of 2003. Plaintiff's amended complaint lists eighteen defendants:

(1) Michigan Department of Corrections (MDOC);
(2) Special Activities Coordinator, Corrections Facilities Administration (CFA) Dave Burnett;
(3) AMF Warden Barry McLemore;
(4) St. Louis Correctional Facility (SLF) Warden Paul Renico;
(5) SLF's Chaplain Carron Caldwell;
(6) SLF's Food Service Director Scott Smith;
(7) Bellamy Creek Correctional Facility (IBC) Food Service Supervisor Bill Black;
(8) Carson City Correctional Facility (DRF) Warden Kurt Jones;
(9) DRF's Assistant Food Service Supervisor Gary Dutcher;
(10) Southern Michigan Correctional Facility (JMF) Warden Sherry Burt;
(11) JMF Dietician Sharon Fairbanks;
(12) Oaks Correctional Facility (ECF) Assistant Resident Supervisor Wendy Bulerski;
(13) ECF's Storekeeper Dave Rick;
(14) AMF Food Service Director Herbert Barry;
(15) AMF's Assistant Food Service Director Ray Gazlay;
(16) AMF's Assistant Resident Unit Supervisor Thomas Perttu;
(17) AMF's Resident Unit Manager Terri Smith; and

(18)    AMF Chaplain K. Snyder.[1]

Plaintiff's claims against defendants are as follows:

1.    Defendant Burnett allegedly violated plaintiff's rights under the First Amendment's Free Exercise Clause, the Fourteenth Amendment's Equal Protection Clause, and RLUIPA by denying plaintiff's special diet requests in 2003 and 2004, granting a special diet request made in 2004 by Buddhist inmate McKinney, "refusing to provide meals in compliance with plaintiff's religious beliefs," and by not authorizing plaintiff to possess the four items of personal property previously listed.  (docket # 34, ¶ 49);

2.    Defendant Caldwell allegedly violated plaintiff's rights under the First Amendment, RLUIPA, and the Fourteenth Amendment's Equal Protection Clause when he purportedly "mislabeled" plaintiff's religion as "other," misrepresented plaintiff's beliefs,  presented false information, refused plaintiff's correspondence, and retaliated against plaintiff for grievances and lawsuits plaintiff had filed (*Id.* ¶ 46), and defendants Caldwell and Renico purportedly violated plaintiff's rights under the Equal Protection Clause in early 2004 when they did not recognize "B.B.P.D. P.O. Box 5234 Hyattsville, Md." as an approved vendor (*Id.* ¶ 48);

3.    Defendants Renico, Burt, Black, Dutcher, S. Smith, and Jones allegedly violated plaintiff's rights under the same constitutional and statutory provisions by "denying plaintiff adequate meals in compliance with his religious tenets [and] violating policies that mandated double [meal] portions" and Wardens Burt, Jones, and Renico violated these same rights by "enforcing the order of Burnett" and denying plaintiff's requests for a special diet (*Id.* ¶ 50);

---

[1]Defendant Wendy Bulerski has changed her last name to Brinkley.  (docket # 4, Ex. K).  The name Bulerski is utilized in this report and recommendation because it corresponds to the allegations appearing in plaintiff's amended complaint.

4.      Defendant Fairbanks, JMF's dietician, purportedly violated plaintiff's rights under the First and Fourteenth Amendments and plaintiff's statutory rights under RLUIPA[2] by "interfering" with plaintiff's diet (*Id.* ¶ 51);

5.      Defendant Burleski allegedly violated plaintiff's rights under the First Amendment, Fourteenth Amendment's Equal Protection Clause, and RLUIPA by not immediately providing plaintiff with the Neterian books that plaintiff had requested while plaintiff was being held in ECF's administrative segregation unit (*Id.* ¶ 52);

6.      Defendant Rick allegedly deprived plaintiff of his "chant beads" without adequate notice or a hearing in violation of plaintiff's rights under the First and Fourteenth Amendments and RLUIPA (*Id.* ¶ 53);

7.      Defendants McLemore, Perttu, and T. Smith allegedly violated the same constitutional and statutory provisions by allowing the removal of plastic wrapping covering plaintiff's food trays outside plaintiff's presence (*Id.* ¶ 54);

8.      Defendants Barry and Gazlay allegedly violated the same constitutional and statutory rights by "alleging that plaintiff was receiving a strict vegetarian diet in compliance with his religious tenets which was a false material representation, they knew or made it recklessly without knowledge of its truth or falsity" and that plaintiff "acted on this assuming he was receiving a diet in compliance with his religious beliefs" (*Id.* ¶ 55);

---

[2]Paragraph 51 of plaintiff's amended complaint is devoid of any specific reference to RLUIPA.  Indulgently, I have treated this as an oversight by plaintiff because the "least restrictive means" test referenced in paragraph 51 could only apply to a RLUIPA claim and not a First or Fourteenth Amendment claim.

9.     Defendant T. Smith allegedly retaliated against plaintiff for protected conduct of filing grievances and lawsuits in violation of plaintiff's First Amendment rights and rights under RLUIPA when the resident unit manager purportedly approved plaintiff's transfer to another prison, where for less than a week in April 2007, plaintiff allegedly "missed over 8 meals as not to become unpure" (*Id.* ¶¶ 44, 56);

10.    Defendants Barry, Snyder, and Gazlay allegedly violated plaintiff's Fourteenth Amendment Due Process, First Amendment, and RLUIPA rights by temporarily removing plaintiff from "his  religious diet [and] denying him meals in compliance with his religious tenets," and allegedly taking the action in retaliation for plaintiff's filing grievances and protected conduct" (*Id.* ¶ 57); and

11.    Defendant MDOC's Policy Directive 05.03.150 allegedly violated plaintiff's rights under the First Amendment, Fourteenth Amendment, and RLUIPA (*Id.* ¶ 58).

Additionally, plaintiff appears to assert Eighth Amendment claims.  The amended complaint mentions the Eighth Amendment in the request for relief.  (docket # 34 at 19, ¶ 1).  The Eighth Amendment is alluded to in paragraph 23, where plaintiff states that "he wrote grievance 04010021902D against defendants Burnett, Burt, Renico, Black, S. Smith, Jones, Ducther [sic], and Fairbanks" in which he claimed they had held plaintiff in their institutions in a conspiracy to deprive plaintiff of his Eighth Amendment rights because they  failed to provide plaintiff with "extra non meat portions per policy for religious diet restrictions."  Paragraph 41 of the amended complaint alleges that "in grievance AMF 06060184428A against [defendants] McLemore, Perttu, T. Smith, Barry and Gazlay" plaintiff claimed that the removal of the plastic wrap from his dinner trays outside his presence constituted "cruel and unusual punishment."  Plaintiff is advised that the court will not

hereafter undertake a "scavenger hunt" through his pleadings in an effort to decipher whether plaintiff is claiming a violation of his constitutional rights.   See FED. R. CIV. P. 8.   Simply mentioning a claim in a grievance does nothing to inform the court or the defendants whether plaintiff is now asserting the same claim in his lawsuit.   Indulgently, plaintiff's purported Eighth Amendment claims with regard to "double portions" against defendants Renico, Burt, Black, Dutcher, S. Smith, and Jones, and his plastic wrap claims against McLemore, Perttu, T. Smith, Barry, and Gazlay will be addressed herein.[3]

Plaintiff asks the court, in its discretion, to exercise supplemental jurisdiction over his purported state-law "gross negligence" claims against defendants McLemore, Barry, and Gazlay for "serving 1/2 or 3/4 portions of the required meals" and by "sending [plaintiff] food trays that do not have the capacity to hold the required amounts."   (docket # 34 ¶ 59).   Paragraph 60 of the amended complaint contains a less specific "gross negligence" claim against all defendants other than the Michigan Department of Corrections.   (*Id.* ¶ 60).   Defendants are sued in their "official and individual capacities."   (*Id.* ¶¶ 4-10).   Plaintiff seeks monetary damages, declaratory and injunctive relief, and "requests that criminal charges be brought on all [defendants] found liable under 18 USC § 242."[4]   (*Id.* at 19-20, ¶¶ 1-6).

_____

[3]Plaintiff's brief (docket #54 at 1) reinforces the conclusion that plaintiff is attempting to assert Eighth Amendment claims.

[4]The Executive Branch rather than the Judicial Branch initiates criminal charges for alleged violations of federal law.   Plaintiff lacks standing to initiate criminal charges against any defendant. *See Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973).   Moreover, criminal statutes do not create private rights of action unless Congress expressly so provides. *Cok v. Consentino*, 876 F.2d 1, 2 (1st Cir. 1989).   It is well settled that 18 U.S.C. § 242 does not provide a private cause of action. *See United States v. Oguaju*, 76 F. App'x 579, 581 (6th Cir. 2003)(citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994)); *Owens v. Johnson*, No. 98-1728, 1999 WL 777453, at * 1 (6th Cir. Sept. 16, 1999); *see also Lynch v. Bulman*, No. 06-1018, 2007 WL 2993612, at * 2

## Applicable Standards

When reviewing cross-motions for summary judgment, the court must assess each motion on its own merits.  *See Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Group*, 415 F.3d 487, 493 (6th Cir. 2005); *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005).  "'[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate.'" *Bowling Irrevocable Trust*, 410 F.3d at 309 (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004), *cert. denied*, 545 U.S. 1128 (2005)); *see Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1123 (2007).

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Swiecicki v. Delgado*, 463 F.3d 489, 492 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

---

(10th Cir. Oct. 15, 2007); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1048 (9th Cir. 2006).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006); *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). "A nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations. Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment. The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may

disbelieve factually uncontested proof." *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

A moving party with the burden of proof (typically the plaintiff) faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## Facts

The following facts are beyond genuine issue.  Plaintiff is currently 37 years old.  Medical records show that plaintiff has not suffered from any serious medical condition at any time relevant to the claims he is currently asserting against defendants.  Plaintiff is serving a prison sentence of eight-to-fifteen years' incarceration on his Wayne County Circuit Court convictions of two counts of third-degree criminal sexual conduct.  When plaintiff began serving his sentences in June of 1997, he weighed 155 pounds.  (docket # 55, Ex. A2, attachment 559).  Plaintiff's medical records show that years later, on January 31, 2003, plaintiff weighed 166 pounds.  (docket # 34-2 at 2).  On February 14, 2003, plaintiff achieved his maximum recorded weight of 170 pounds, fifteen pounds more than he weighed when he began serving his prison sentence.  (docket # 34-2 at 1).

1.    **St. Louis Correctional Facility**

In March of 2003, plaintiff was an inmate at the St. Louis Correctional Facility (SLF), located in St. Louis, Michigan.  SLF, like all Michigan prisons,  provided a lacto-ovo (dairy-egg) vegetarian menu option.  Vegetarian meals served at SLF complied with the "Recommended Dietary Allowances/Dietary Reference Intakes" specified by Policy Directive 04.07.100 "Standards for Meals in Institutions."  At all times relevant to his complaint plaintiff has remained free to eat from the vegetarian menu served in Michigan's prisons.  (Ex. D., S. Smith Aff. ¶¶ 4-6; Ex. I, Fairbanks Aff. ¶¶ 4, 5).[5]

In March of 2003, Carron Caldwell, SLF's Chaplain, received correspondence from plaintiff requesting that plaintiff  be removed from "the Sunni Muslim callout and to be served a

_____

[5]Unless otherwise indicated, lettered exhibits refer to docket # 4, the defendants' exhibits in support of their motion for summary judgment.

strict vegetarian diet." Very few Michigan prisons are equipped to serve a "strict vegetarian" menu. SLF is not one of them. (S. Smith Aff. ¶¶ 6, 9; Ex. G, Black Aff. ¶¶ 5-7). Defendant Caldwell also received plaintiff's Change of Religious Preference form in which plaintiff identified that his religious affiliation as "an Ausarian who teaches and practices Islam as a rite only." (Ex. C, Caldwell Aff. ¶ 6; Plf. Aff. ¶ 3, docket # 55; *see* docket # 34-2 at 8). MDOC policy directives permit prisoners to change religious affiliation and to request authorization to eat from a religious menu, but limit how frequently prisoners can make such requests. An inmate may change his religious affiliation by providing written notice no more than twice a year and request approval to eat from a religious menu no more than once per year. (Ex. A, Policy Directive 05.03.150, ¶ K)[6]. An inmate's religious affiliation is recorded in the Corrections Management Information System (CMIS). The MDOC has a limited number of options available for use on its computer database for identification of prisoner faith groups. On March 27, 2003, defendant Caldwell wrote "other" on face of plaintiff's form indicating that plaintiff's designated religious preference should be entered on the CMIS system as "other," because no CMIS code existed for plaintiff's stated religion: "Ausarian who teaches and practices Islam as a rite only." (Caldwell Aff., ¶¶ 5, 7; docket #55-3 at 444). The terms Ausarian and Neterian are used interchangeably. *See e.g.*, Ex. B attachment ("Neterian Ausarian [] is also known as Neterism, Asarianism, Neter and the Ausarian Religion."). Plaintiff has referred to his religion as "Ausarian (Asarian) a branch of Neterian religion." (docket # 34, ¶ 12). Plaintiff's affidavit states that he is "a follower, believer, and practitioner of the Neterian religion." (docket # 55, Plf. Aff. ¶ 1). Very few inmates have designated "Netarian" or "Ausarian" as their faith

___

[6]Under the revised version of Policy Directive P.D. 05.03.150, effective September 20, 2007, the limitation on the frequency of declared changes of religious affiliation is found in paragraph S and the limitation on the frequency of special diet requests is located in paragraph SS.

preference.  The term "other" is used by the MDOC when recording numerically small faith groups within Michigan's prison population:  Wicca, Asatru/Odinism, Hinduism, Baha'i, Satanism, and Rastafaria are all listed as "other" on CMIS.  (Ex. B, Burnett Aff. ¶ 7; docket # 55, Ex. A1, attachments 449-50).

On receipt of plaintiff's request for a special diet, defendant Caldwell conducted an interview and attempted to obtain information from plaintiff regarding his religious beliefs by way of a questionnaire the MDOC uses for that purpose.  Plaintiff did not cooperate in supplying verbal information, and provided only very vague answers.  Plaintiff attempted to substitute a written document that he had prepared in advance of the interview.  (Plf. Aff. ¶ 2, docket # 55).  According to plaintiff, defendant Caldwell required him to respond to the questionnaire rather than accepting plaintiff's papers.  (*Id.* ¶ 3).

Defendant Caldwell sent plaintiff's request for a special diet and plaintiff's questionnaire responses to the Correctional Facilities Administration (CFA) Special Activities Coordinator, Dave Burnett.  (Caldwell Aff. ¶¶ 6, 8 and attachments).  Burnett received the report that plaintiff had been less than cooperative during the interview and had provided almost no information about his faith or its dietary requirements.  In defendant Burnett's experience, prisoners who are unable or unwilling to discuss their faith and its dietary requirements but instead rely on copious written materials are generally seeking to obtain special privileges based on claimed religious beliefs.

On March 31, 2003, defendant Burnett denied plaintiff's request for the accommodation of a strict vegetarian diet.  (Ex. B, Burnett Aff. ¶¶ 10-12 and attachment; docket # 33-2 at 41).

-12-

MDOC prisoners are permitted to abstain from eating foods that violate their religious tenets. (Ex. A, Policy Directive 05.03.150, ¶ FF). SLF's food service offered vegetarian options at the dinner and lunch meals, and all SLF prisoners remained free to choose this option. (Ex. D., Smith Aff. ¶ 4). The State's vegetarian menu provides for calories and protein comparable to that of the meat menu. (Ex. G, Black Aff. ¶¶ 6-7). Generally, when plaintiff has determined that the food supplied to him at State expense has been deficient to meet his needs in some respect, plaintiff has been able to purchase alternative foods from prison stores. (Plf. Aff. ¶ 17).

On April 10, 2003, long after Burnett had denied plaintiff's request, plaintiff filed a grievance against Caldwell for not accepting a two-page document that plaintiff had proffered during his interview. (Grievance No. SLF 03-04-0119-20z, docket # 55, Ex. A, attachment 42). The Step I grievance response noted that plaintiff had refused to answer the questions that CFA required and that plaintiff had attempted to substitute written materials rather than answering the questions. (*Id.* at 43). Plaintiff's grievance was denied. Plaintiff pursued an appeal to Step II where he complained that Caldwell "failed to represent" plaintiff and claimed that his beliefs were too complex to be explained in a few lines. (*Id.* at 44). Plaintiff's Step II and III appeals were denied. (*Id.* at 44).

On April 16, 2003, defendant Burnett responded to correspondence he had received from plaintiff. Burnett's letter noted that plaintiff had attempted to bypass SLF's chain of command by sending a request for the accommodation of a strict vegetarian diet directly to Burnett. Burnett advised plaintiff that his request was improper and that it would not be processed. (docket # 55, Ex. A, attachment 59).

Plaintiff was found guilty of misconduct charges at SLF and he was temporarily placed on loss-of-privileges (LOP) status. Use of SLF's microwave is a privilege that is not

available to prisoners on LOP status.  (Ex. F, Renico Aff. ¶ 3 and attached SLF Prisoners' Rules

Package, ¶ 32).  Plaintiff filed a Step I grievance on March 24, 2003 (Grievance No. 03030091717a)

against SLF's warden, defendant Renico.  Plaintiff's grievance identified March 20, 2003 as the date

of the incident.  Plaintiff complained that while on LOP status, pursuant to the prison's housing unit

rules, plaintiff  was not allowed the privilege of using the prison's microwave oven.  Plaintiff

claimed that the First and Eighth Amendments guaranteed him the constitutional right to use of a

microwave oven. (docket # 1, attachments at 20).  Plaintiff's grievance went on to state that he was

a "vegetarian by religion."  (*Id.*).  Plaintiff claimed that SLF's meals were not adequate in that they

sometimes included eggs or cottage cheese.  (*Id.*).  The Step I grievance response stated that use of

a microwave oven was not a right guaranteed by any amendment to the Constitution.  It was a

privilege that plaintiff had temporarily lost as a result of his misconduct conviction.  With regard to

plaintiff's complaints about the adequacy of SLF's food service, plaintiff was advised that the

prison's meal service met the dietary requirements established by the State of Michigan.  Plaintiff

was not authorized to receive any special diet.  The denial of plaintiff's grievance was upheld at

Steps II and III.  (docket # 1 attachments 23, 24).

### 2.      Carson City Correctional Facility

On April 24, 2003, plaintiff was transferred to the Carson City Correctional Facility

(DRF), located in Carson City, Michigan.  DRF did not serve a vegan diet.  Plaintiff was never

authorized to eat from such a special diet menu at any time during his incarceration at DRF.  (Ex.

H, Dutcher Aff. ¶¶ 4-5).  Plaintiff directed a request for a special diet to Warden Jones.  Warden

Jones responded that plaintiff's request had already been denied by Burnett.  (docket # 55, Ex. A,

attachments 465, 467).  A prisoner whose request to eat from a religious menu is denied can reapply one year after the denial.  (Ex A, P.D. 05.03.150, ¶ KK).

Medical progress notes dated May 2, 2003, indicate that plaintiff weighed 160 pounds.  (docket # 34-2 at 16).  Plaintiff had experienced a minimal weight change of two pounds since August 21, 2002.  (docket # 55, Ex. 2A, attachment 552).  On June 13, 2003, plaintiff drafted grievance number DRF-03-06-0697-09E complaining that he was not being provided with a strict vegetarian diet corresponding to his religious beliefs.  Defendant Dutcher provided the Step I grievance response that plaintiff was not eligible to eat from a religious menu because his request for a special menu had recently been denied.  (Dutcher Aff. ¶ 5).  Warden Jones denied plaintiff's Step II appeal on the same basis.  Plaintiff's Step III appeal was denied.  The Step III response emphasized that plaintiff remained free to select the non-meat diet which provided all of the nutritional requirements set forth in Policy Directive 04.07.100 "Standards for Meals in Institutions." (9/16/03 Step III grievance response, attachment to Dutcher Aff.).

### 3. Southern Michigan Correctional Facility

Plaintiff was an inmate at the Southern Michigan Correctional Facility (JMF), located in Jackson, Michigan, from July 24, 2003 through January 12, 2004.  (Ex. E).  Plaintiff's medical records dated August 14, 2003, showed that over his many years of imprisonment, plaintiff had experienced a very slight weight gain.  Plaintiff weighed 157 pounds as compared to the 155 pounds he weighed on admission to MDOC's custody.  (docket # 55, Ex. 2A, attachment 559).  During plaintiff's incarceration at JMF, Dr. Aydar had drafted an order for a dairy-free, vegetable-only diet for plaintiff based on plaintiff's religious beliefs rather than medical reasons.  After being contacted

-15-

by the MDOC's dietary manager's office, Dr. Aydar immediately discontinued the diet order.  (Ex.

I, Fairbanks Aff. ¶ 7; docket # 55, Ex. A1, attachment 471).  Plaintiff believes that Dr. Aydar's

"order was valid for 15 days, and was not actually canceled until 1-12-04."  (Plf. Aff. ¶ 18).

On August 20, 2003, Burnett responded to additional correspondence from plaintiff.

(docket # 55, Ex. A, attachment 110).  Burnett reiterated that all prison facilities offered non-meat

entrees as a substitute whenever meat entrees are offered.  Non-meat entrees are not presented as

strict vegetarian meals.  Burnett's letter reiterated that plaintiff's request for accommodation had

been denied because plaintiff had not cooperated in the interview process required by policy.  Burnett

wrote, "You express concern because you spend much of your time in segregation status.  Again, that

is your choice and you have to accept responsibility for choosing to spend time in segregation."  The

letter concluded with the following paragraph:

> As noted in earlier correspondence, you will be eligible for review for the strict vegetarian
> menu again on 3/31/04.  I encourage you to cooperate with Department Policy and staff
> regarding these matters.

(*Id.*).


### 4.    St. Louis Correctional Facility

Plaintiff was transferred back to SLF on January 12, 2004.  On January 12, 2004,

plaintiff weighed 167 pounds.  (docket # 55, Ex. A2, attachment 564).

On February 5, 2004, plaintiff drafted a kite (informal complaint) directed to Warden

Renico and Chaplain Caldwell.  Plaintiff requested that he be allowed to purchase books from

"B.B.P.D. P.O. Box 5324 Hyattsville, Md."  (docket # 55, Ex. A, attachment 165).  Plaintiff

represented that he intended to purchase books related to the study and practice of his religion.

Plaintiff did not identify his religion by name, but described it as being "non-traditional and African based." (*Id.*). Plaintiff represented that the unspecified books he desired could "only be obtained through black book stores." (*Id.*). Plaintiff's kite cited the prisoner mail policy, Policy Directive 05.03.118, which is designed to prevent the introduction of contraband items into prisons through used books and magazines. The policy requires that books, magazines, and other publications come directly to the prison from an approved publisher or vendor:

> Prisoners shall be permitted to receive books, magazines, and other publications only if sent directly to the prisoner from the publisher, ordered by a member of the public from an Internet vendor identified in Attachment A and sent directly to the prisoner by the vendor, [or] ordered by the prisoner from a vendor identified in Attachment B and sent directly to the prisoner from the vendor. . . .

(Policy Directive 05.03.118, ¶ Y; *see* partial copy of policy directive attached to docket # 55, Ex. A). Amazon.com and other Internet vendors listed in Attachment A of P.D. 05.03.118 sold Neterian books. The same was true for the national booksellers such as Barnes & Noble listed in the policy directive's Attachment B. Attachment B also contained a provision that permitted the warden or his designee to "authorize local vendors from whom prisoners at their respective facilities may order and receive non-used publications." (Policy Directive P.D. 05.03.118, Attachment B, ¶ C). The warden's authority in this regard included vendors of "non-used religious publications." (*Id.*, ¶ D). SLF prison staff approved a disbursement authorization for the purchase of books from B.B.P.D. (docket # 55, Ex. A, attachment 200). Prison staff had erroneously authorized the purchase without first verifying that plaintiff's book order was through an authorized vendor. When the two books arrived at SLF, they were rejected because they were not from an authorized vendor. On March 30, 2004, while plaintiff's hearing on the rejection of the two books was pending, plaintiff wrote to Warden Renico and the grievance coordinator and stated that plaintiff's grievance could be

"rectified" by the warden's approval of "B.B.P.D. Book Publications P.O. Box 5234 Hyattsville, Md." (*Id.*, attachment 210).  Because SLF's prison staff had been at fault, plaintiff was allowed to send the two books home at the prison's expense.  (*Id.*, Ex. A1, attachment 456).

In April 2004, plaintiff made another request for a special diet.  Defendant Caldwell interviewed plaintiff.  Plaintiff prepared written materials before the interview which, according to plaintiff, Caldwell refused to accept.  (Plf. Aff. ¶ 4; *see* docket # 55, Ex. A, attachment  62).  Caldwell conducted the interview.  Interview results were forwarded to defendant Burnett.  (Caldwell Aff. ¶ 10 and attachment; docket # 55, Ex A-1, attachment 483).  On April 16, 2004, Burnett denied plaintiff's request for a special religious diet.  Plaintiff had provided almost no information about his religion other than his assertion that it was against his religion to eat animals.  (Burnett Aff. ¶ 13; docket # 55, Ex. A-1, attachment 486).  Burnett's response reiterated that plaintiff remained free to select non-meat items from the main meal line if he so desired.  (*Id.*).

On June 2, 2004, Warden Renico responded to a kite from plaintiff.  Renico stated that plaintiff's four-page submission had been faxed to Burnett in Lansing.  In response, Burnett had indicated that plaintiff's request for a strict vegetarian menu had been denied on April 16, 2004.  (docket # 55, Ex. A, attachment 253).

On or about June 8, 2004, plaintiff drafted a letter to defendant Burnett (docket # 55, attachments at 33) and enclosed with it scattered excerpts (pages 12-15, 74-75, 160-61, 192-93, 230-31, and 272-73) from the book *Metu Neter II*.  Plaintiff had apparently intended this correspondence as an attempt to appeal Burnett's decision, entered two months earlier, denying plaintiff's request for a special religious diet.  On June 25, 2004, defendant Burnett wrote a response to plaintiff's letter noting, among other things, the following:

- Page 193 states that "It is best to avoid animal products." It does not indicate that it is a violation of faith to eat animal products. It does not say that one is forbidden to do so.

- It is noted that in the list of forbidden acts on pages 272-273, there are no dietary requirements.

Regardless of the above, your request for accommodation with the strict vegetarian menu was processed on April 16, 2004 and you were denied on the basis of the information you provided at that time. Your request was processed according to Department Policy. Policy requires that you wait one year before being reviewed again. Policy makes no allowance for an appeals process. I will not entertain your request until on or after April 16, 2005.

(docket # 55, Ex. A, attachment 263).

On July 24, 2004, defendant Burnett approved a request for a strict vegetarian diet made by Buddhist inmate McKinney at the Chippewa Correctional Facility. Burnett's letter noted that McKinney had participated in the interview conducted by Sandy Shaw. McKinney had provided information regarding Buddhist beliefs and had provided basic information regarding Buddhism's dietary requirements. (docket # 55, Ex. A1, attachments 404A, 477, 482).

### 5.    Oaks Correctional Facility

Plaintiff was an inmate at the Oaks Correctional Facility (ECF), located in Manistee, Michigan, between February 24, 2005 and July 2005. Defendant Rick was responsible for searching all incoming prisoner property for contraband. Under MDOC Policy Directives 04.07.112 (Prisoner Personal Property) and 05.03.102 (Resident Hobbycraft Programs), beadcraft was not permitted. When defendant Rick searched and inventoried plaintiff's property on February 24, 2005, he identified as contraband the following items: "one hanger, one stocking-type hat that appeared to be homemade, and one string of beads in the form of a necklace which appeared to be homemade or hobbycraft." These items were noted on plaintiff's Prisoner Personal Property Receipt (form CSJ-

241B).  When plaintiff was presented with the property receipt, he refused to sign it.  On March 25, 2005, after the expiration of thirty days, a notice was sent to plaintiff stating that he had ten days to dispose of these items.  (Policy Directive  04.07.112, ¶¶ CC, OO, effective 11/15/04).  Plaintiff was expressly advised that if he did not dispose of these items within the time indicated, the personal property items would be destroyed after April 11, 2005.  The items were destroyed on April 12, 2005.  (Ex. J, Rick Aff. ¶¶ 3-8).

On February 27, 2005, plaintiff was housed in ECF's segregation unit.  On that date, plaintiff requested legal books from Assistant Resident Supervisor Wendy Burleski.  Defendant Burleski personally retrieved and delivered to plaintiff two law dictionaries, the Michigan Rules of Court, the Prisoner Self-help Litigation Manual, and other legal texts and publications that plaintiff had requested.  (Ex. K, Bulerski Aff. ¶¶ 2-5).  In response to plaintiff's request for religious books, Burleski offered plaintiff a Bible or Koran that she had at her disposal.  Plaintiff states that "Burleski was forced by [] Assistant Deputy Warden Pratt to go into [plaintiff's] property and retrieve several of plaintiff's Neterian books."  (docket # 55, Plf. Aff. ¶ 20 and Ex. A, attachment 286).  Documents submitted by plaintiff show that on March 1 and March 3, 2005, plaintiff filed "access to courts -- flash kites" stating that he had filed a lawsuit in the Eastern District of Michigan, *Cain v. MDOC, et al.*, 2:04-cv-74765-DT, and that he was requesting three books (*Serpent Power*, *Wisdom of Maati*, and *Anunian Theology*) from his collection because he needed them in connection with his lawsuit.  On March 9, 2005, plaintiff was supplied with all three books from his collection.  (docket # 55, Ex. A, attachments 284, 286).  Plaintiff suffered no prejudice to his litigation.  On March 21, 2005, plaintiff filed a motion to amend his complaint and on March 24, 2005, he filed a brief in response to a then-pending motion to transfer.  Case number 2:04-cv-74765-DT was dismissed without

prejudice by United States District Judge Nancy G. Edmunds on March 16, 2006, pursuant to 42 U.S.C. § 1997e(c)(1) because plaintiff had not exhausted his administrative remedies as required by the Prison Litigation Reform Act under the Sixth Circuit precedent then in effect.

On April 22, 2005, defendant Burnett approved plaintiff's request to eat from a religious menu. Plaintiff had cooperated with Chaplain Weinberger at ECF during the interview process, exhibited knowledge about his faith, and provided documentation indicating that his faith required a strict vegetarian diet. (Burnett Aff. ¶14 and attachment; Plf. Aff. ¶ 6 and Ex A1, attachment 482).

6.     **Baraga Maximum Correctional Facility**

Plaintiff has been an inmate at Baraga Maximum Correctional Facility (AMF) since July 2005. Although plaintiff has been approved to receive a special diet during his confinement at AMF, plaintiff has found that the transportation, packaging, delivery, and contents of his meals at AMF are not satisfactory. Plaintiff expressed concern that disposable tray lids were not staying closed during the meal transportation process and that plaintiff's meals were cold when they arrived. AMF had introduced disposable trays in an effort to ensure that the dishes used for special meals were separate from the trays used for animal products. Plaintiff asked that the disposable trays be wrapped in plastic to keep the lids closed and prevent contamination during delivery. Defendant Barry observed the disposable trays could warp when placed in the hot box, and he agreed with plaintiff's suggestion that these trays be wrapped to keep lids closed during transportation. AMF is a maximum security prison. Its inmates are not permitted to possess plastic wrap. The plastic wrap is removed before the tray is passed to the prisoner. (Ex. N, Perttu Aff. ¶ 3; Ex. O, T. Smith Aff.

¶¶ 3-4).  AMF's food service employees, such as Barry, have no control over this issue, which is in the hands of security staff.  (Barry Aff. ¶¶ 5-8).

On January 24, 2006, plaintiff filed grievance number AMF-06-01-303-09Z.  (docket # 55, Ex. A, attachment 330).  This grievance was against defendants McLemore, Perttu, and Gazlay.  Plaintiff stated that his soy milk was brought to him in a Styrofoam cup with a removable lid, and that the lid usually cracked during the removal process.  Plaintiff indicated that he had made a request to have his "trays/milk" wrapped until it reached his cell.  Plaintiff's grievance stated that the above-referenced defendants denied his request.  Plaintiff asserted in this grievance that more than three months earlier an Officer Marvin had "poured disinfectant" on plaintiff's food.  Plaintiff claimed that a different officer had poured disinfectant in plaintiff's soy milk on November 11, 2005.  Finally, plaintiff claimed that Officer Perry had served plaintiff soy milk on January 23, 2006, that smelled like urine, and plaintiff believed that its lid had been tampered with.  Plaintiff's affidavit makes clear that he had simply assumed that there was urine in his soy milk based on its smell.  Plaintiff's affidavit provides no insights regarding the two purported instances where plaintiff believed that his food had been contaminated with disinfectant.  (Plf. Aff. ¶ 21).  Plaintiff's grievance demanded that defendants protect his food.  Plaintiff stated that his grievance was against McLemore, Perttu, and Gazlay "for refusing to address and protect [plaintiff's] right to receive a diet in compliance with his religious beliefs and allowing staff to continuously poison [plaintiff's] food with urine, [and] disinfectant in violation of state law." (docket # 55, Ex. A, attachment 330).  The grievance response indicated that to the extent that plaintiff was making a belated attempt to grieve the purported "disinfectant" incidents that had allegedly occurred months earlier,  plaintiff's complaints were "well outside the time for filing a Step I grievance and therefore [would] not be

addressed." With regard to plaintiff's complaint about his January 23, 2006 soy milk, there was no evidence that plaintiff's milk or meal had been tampered with. The denial of plaintiff's grievance was upheld through Step III. (docket # 55, Ex. A, attachments 331, 346).

Plaintiff filed a grievance in March of 2006 (AMF-06-03-809-09Z), arguing that plastic wrapping should not be removed from his meal trays outside his presence. Warden McLemore's Step II response was that the prison's staff is required to remove the plastic wrapping before a meal is delivered to a maximum security prisoner, among other things to make sure that the container is not being used as a means for moving contraband. Furthermore, the Constitution has never required that plastic wrap be removed from a prisoner's meal in a prisoner's presence. (docket # 55, Ex. A, attachment 340).

On January 31, 2006, plaintiff filed a grievance claiming that the disposable meal trays that AMF had been using since January 27, 2006, were smaller than the prison's reusable trays. Plaintiff claimed that the meals he was receiving were too small. (AMF-06-01-400-09a). (docket # 55, Ex. A, attachment 333). Plaintiff's grievance was denied, and his appeals through Step III were unsuccessful. (*Id.*, attachment 348). AMF's disposable trays are not smaller than the old reusable trays. "The reusable trays that were used prior to the disposable trays for the Strict Vegetarian Diets measured 9 x 11 x 2. The disposable trays currently used for these special diets measures 9.3 x 9.3 x 3." The difference in dimensions is in the tableware section, not the food trays. Prisoner William Carthen signed an affidavit on June 26, 2007, stating that he receives a strict vegetarian diet at AMF. Prisoner Carthen states that his meal trays are divided into three sections. Prisoner Carthen estimates that the two smaller sections hold four ounces each. He further estimates that the largest tray section holds about two and one-half cups. (docket # 55, Ex. A2, attachment 594). The diet plaintiff has

received at AMF is nutritionally adequate and in compliance with State policy.  (Barry Aff. ¶¶ 3-9; Ex. M, Gazlay Aff. ¶¶ 3-4).

On January 22, 2006, plaintiff drafted a written request that he be allowed to purchase and possess a necklace of chant/meditation beads, an ankh symbol, incense, and a meditation rug, mat, or blanket.  (docket # 55, Ex. A, attachments 354-55).  Under paragraph LL of the version of Policy Directive 05.03.150 then in effect, the CFA's deputy director, defendant Burnett, would make the MDOC's final determination whether the four items requested posed a threat to the security of the prison and whether the requested items were necessary to the practice of the prisoner's religion. (*Id.* at 356).

On March 17, 2006, defendant Burnett wrote a letter requesting that plaintiff provide Burnett with additional information:

> I am in receipt of your recent correspondence in which you request approval to purchase and possess certain items of religious property for your pursuit of the practice of Neterism.  I need at least two things to process your request:
>
> 1.  Some items are available from current vendors i.e. an ankh.  However, I need access to a catalogue from which you could order such items as beads.  For instance, I need to be able to view that item in the catalogue before the decision can be made to approve or deny.  Do you have an appropriate catalogue?  Or the name, address, or phone number of a company from whom I can request a catalogue?
>
> 2.  Although you have provided some information about your faith, I need to know the name of an appropriate book or books that outline the required practices of your faith.  What book(s) can I access to find out about your faith?
>
> This letter is neither an approval nor a denial of your request.  It is my request for additional information.  I will take no further action until I hear back from you.

(docket # 55, Ex. A, attachment 358).  On March 30, 2006, plaintiff drafted a letter in response. (docket # 55, Ex. A, attachments 360-61 and Exhibit A1, attachments 362-65).  Plaintiff's

disbursement authorization for mailing his letter to Burnett listed case number "04 74765 DT," referring to plaintiff's then-pending lawsuit in the Eastern District, 2:04-cv-74765-DT.   The disbursement shows that plaintiff requested expedited and special handling of his letter as legal mail related to his lawsuit rather than a response to Burnett's March 17, 2006 correspondence.  (docket # 55, Ex. A, attachment 359).  On February 14, 2006, United States Magistrate Judge Majzoub entered a report and recommendation recommending that case number 2:04-cv-74765-DT be dismissed without prejudice pursuant to 42 U.S.C. § 1997e(c)(1).  On March 16, 2006, Judge Edmunds adopted the report and recommendation over plaintiff's objections, and entered a judgment dismissing plaintiff's claims.  Nothing in the record indicates Burnett's receipt of plaintiff's March 30, 2006 letter.  Burnett has no recollection of plaintiff's request for permission to purchase and possess the four personal property items that plaintiff now claims are necessary for the practice of the Neterian faith.  (Burnett Aff. ¶ 15).  The record does not establish with any precision the size, shape, weight, material composition, supplier or other critical details regarding the four items that plaintiff states are required by his faith, the impact the absence of the items has on plaintiff's practice of his faith, and the dangers the requested items would pose in the maximum security prison context.

On or about November 22, 2006, plaintiff began working at AMF as a "prep cook." While opening cans of Bountiful Harvest instant mashed potatoes, plaintiff discovered that the label indicated that the instant potatoes contained milk and whey solids.  Plaintiff filed a grievance on November 26, 2006, against "Caruso, Armstrong, Burnett, Straub, McLemore, Barry, and Gazlay. (Ex. P, Grievance No. AMF-06-11-04038-09z).  The Step I grievance response indicated that this food service problem had been solved by substituting fresh potatoes for instant potatoes.  Plaintiff pursued an appeal to Step II.  The warden's Step II response contained an apology for the oversight

on behalf of AMF, reiterated that once plaintiff alerted food service to this problem it had been

corrected, and the warden considered the matter resolved.  Plaintiff pursued an unsuccessful Step

III appeal.  (*Id.*).

On January 11, 2007, plaintiff drafted a grievance (AMF 07-01-00187-09d, docket

# 55-3, Ex. A1, attachment 430) regarding pita bread from "Grecian Delight Foods, Inc. of Elk

Grove, Illinois," that plaintiff had been served on January 11, 2007.  Plaintiff's grievance complained

that this pita bread contained "nonfat dry milk, and milk."  His grievance was against defendants

"Burnett, Barry and Gazlay" for their purported reckless disregard for plaintiff's rights under

RLUIPA and the First Amendment.  Plaintiff's grievance concluded with this statement:

> I demand this be rectified as well as civil action will be taken.  As the above have been
> deceiving me and preventing my purification, as well as causing me to defile myself,
> religiously [sic].

(*Id.*).  The Step I grievance response stated that the oversight had been corrected immediately after

plaintiff had informed food service staff of the problem.  The pita bread was replaced with a flour

tortilla shell that did not contain any dairy products.  Plaintiff chose not to resolve the grievance at

Step I and pursued an appeal to Step II, stating his reason for appeal in the following terms:

> The response is unacceptable and an insult.  Barry and Gazlay have a duty to ensure that we
> receive a proper diet by policy and it is obvious that no concern for our diets was looked [sic]
> into cause [sic] if it was the contains [sic] of the label would have been read prior to
> purchasing, nor does it negate fraud, by causing me to think I was receiving a diet in
> compliance with my beliefs and further causing me to defile myself by eating it for over 17
> months this product has been served.

(*Id.* at 433).  The Step II response found that the food service staff's response had been appropriate

and that the grievance regarding pita bread was considered resolved.  (*Id.* at 432).  The Step III

response recommended that the prison's administrative staff take steps to ensure that the products

-26-

served to prisoners on strict vegetarian diets be checked more carefully for compliance prior to being served.  (*Id.* at 436).

In April 2007, plaintiff received his an annual security classification screen.  (docket # 55, Ex. A1, attachments 441-42).  The calculations were submitted by Robert Warr and approved by Linda Tribley.  On April 6, 2007, plaintiff was transferred from AMF, a Level V prison, to the Marquette Branch Prison (MBP), a Level IV prison.  On April 11, 2007, plaintiff was transferred back to AMF.  On April 11, 2007, plaintiff filed a grievance stating that MBP did not offer the strict vegetarian diet.  This grievance was against the transfer coordinator who had initiated, authorized and approved plaintiff's transfer to MBP.  Plaintiff claimed violation of his rights under the First Amendment, RLUIPA, and Michigan prison policy directives, and argued that he should not have been transferred to any Michigan prison that failed to satisfy plaintiff's religious-based dietary preferences.  Plaintiff further asserted that his transfer had been the result of retaliation for unspecified "protected conduct."  (*Id.* at 443).  The Step I grievance response indicated that plaintiff had been transferred to MBP by mistake, and that once the error had been discovered, plaintiff was immediately transferred back to AMF where he could receive his strict vegetarian diet.  Plaintiff pursued a Step II appeal.  The Step II response stated in pertinent part, as follows:

> The transfer coordinator at AMF received a request from MBP for a general population prisoner exchange.  The coordinator reviewed the list of eligible prisoners and spoke with unit staff and supervisors.  She was told that the grievant had been demonstrating improved behavior since his reclassification to general population and that a transfer to a new environment would be considered a reward for that behavior.  The transfer coordinator did not at that time, have a list of prisoners on religious diets, which she has now based in part on the problem with the grievant's transfer.

> Your claim that the coordinator was aware of your situation because she is both the RUM and is a defendant in current litigation is not true.  AMF's transfer coordinator is B. SMITH not RUM/DEFENDANT T. SMITH.

Based on the above, no further response to the grievance is warranted.

This grievance is denied.

(docket # 55, Ex. A2 at 510; *see* T. Smith Aff. ¶ 5).

Plaintiff indicates in his affidavit that for approximately two days in late 2007, he had been temporarily removed from his special diet.[7]

## Discussion

### 1.    Mootness

Plaintiff is and has been an inmate at AMF since July 2005.  Plaintiff's claims for declaratory and injunctive relief against defendants Renico, Caldwell,[8] S. Smith, Black, Jones, Dutcher, Burt, Fairbanks, Bulerski, and Rick are moot as a result of his transfer to ATF.  *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *Abdur-Rahman v. Michigan Dep't of Corrections*, 65 F.3d 489, 491 (6th Cir. 1995); *see also Henderson v. Martin*, 73 F. App'x 115, 117 (6th Cir. 2003).

### 2.    Ripeness

The vast majority of plaintiff's claims relate to prison food service.  Liberally construed, plaintiff's amended complaint includes a request for an injunction permitting plaintiff to purchase and possess a necklace of chant/meditation beads, an ankh symbol, incense, and a

---

[7]Plaintiff's affidavit states that some unidentified individual "told him that on the authority of Snyder and Barry [his] meals were canceled."  This hearsay cannot be considered by the court in ruling on the pending cross-motions for summary judgment.  "[I]t is well established that hearsay evidence cannot be considered by a trial court ruling on a motion for summary judgment."  *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000); *see Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006).

[8]Defendant Caldwell is currently employed as the Chaplain at the "Huron Valley Complex-Women (WHV)" prison, located in Ypsilanti, Michigan.  (Caldwell Aff. ¶ 2).

meditation rug, mat, or blanket. (docket # 34, ¶ 11). It is apparent on this record that plaintiff's request for these four items became derailed when plaintiff misdirected his correspondence by indicating that it was "legal mail" related to a pending lawsuit which was later dismissed. As a result, no final determination has ever been made by defendant Burnett whether plaintiff may purchase and possess these items without posing a threat to the custody and security of the maximum security prison where plaintiff is currently housed.

The Constitution limits the power of the federal courts to adjudication of "cases or controversies." U.S. CONST. art. III, § 2. The Article III requirement of a case or controversy has given rise to numerous doctrines of justiciability, including standing, ripeness, mootness, political questions, and the like. "Justiciability is an analytical approach that has been 'developed to identify appropriate occasions for judicial action, both as a matter of defining the limits of the judicial power created by Article III of the Constitution, and as a matter of justifying refusals to exercise the power even in cases within the reach of Article III.'" *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1146 (6th Cir. 1975) (quoting 13 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3529, at 146 (1975)). "Ripeness is a justiciability doctrine designed to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). A case is not ripe for review when it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985). In determining whether a case is ripe for adjudication, the court examines (1) the likelihood that the harm alleged will ever come to pass, (2) whether the factual record is

-29-

sufficiently developed to allow adjudication, and (3) the hardship to the parties if judicial review is denied. *See Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002).

Here, the record is not sufficiently developed to allow adjudication. Plaintiff states in general terms that he needs these personal property items to practice his faith, although they are relatively recent demands in comparison to plaintiff's food-related claims, which relate back to March of 2003. Every additional item of prisoner personal property, particularly in a maximum security prison, makes the administrative task of locating contraband items more difficult. The problem of prisoners fashioning weapons out of seemingly innocuous items is well-documented. At this juncture there is only a vague outline of the items plaintiff desires, and these items may or may not pose a threat to maximum security prison safety and security. At the conclusion of the review process, plaintiff may be allowed to possess all, some, or none of these items. A hardship of denying judicial review on these claims exists, but is relatively minor in comparison to the unwarranted intrusion by the federal courts on the State's operation of its prisons that granting any sort of injunctive relief on this incomplete record would represent. In summary, I recommend that plaintiff's claims against defendant Burnett related to plaintiff's request that he be permitted to possess a necklace of chant/meditation beads, an ankh symbol, incense, and a meditation rug, mat, or blanket be dismissed for lack of ripeness.

### 3.      Eleventh Amendment Immunity

#### A.      Constitutional Claims

Plaintiff's constitutional claims for monetary damages against defendants in their official capacities are barred by Eleventh Amendment immunity. Eleventh Amendment immunity is a threshold issue that should be raised and decided by the trial court. *See Nair v. Oakland County*

-30-

*Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002). A suit against a state officer in his official capacity is simply another way of pleading an action against the state. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The Eleventh Amendment generally[9] bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Skinner v. Govorchin*, 463 F.3d 518, 524 (6th Cir. 2006). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986); *see also Hill v. Michigan*, 62 F. App'x 114, 115 (6th Cir. 2003). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's claims for monetary damages against defendants in their official capacities based on alleged violations of plaintiff's rights under the First, Eighth, and Fourteenth Amendments.

      B.     <u>Statutory RLUIPA Claims</u>

           1.     Sovereign Immunity

Defendants seek dismissal of plaintiff's statutory RLUIPA claims for monetary damages against defendants in their official capacities on Eleventh Amendment immunity grounds. Plaintiff argues that Eleventh Amendment immunity does not bar these RLUIPA claims. (Plf's Brief

---

[9] The well-recognized exception to the general rule is an action for prospective, non-monetary relief such as an injunction against a state officer in his or her official capacity based upon a claim that the state officer's action is unconstitutional. *See Ex Parte Young*, 209 U.S. 123 (1908); *see also Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)(*en banc*).

at 15).  I find that defendants are entitled to Eleventh Amendment immunity on plaintiff's claims for

monetary damages against defendants in their official capacities.

The United States Supreme Court and the Sixth Circuit have never recognized a cause

of action for damages under RLUIPA against a State employee in his or her official capacity, nor

have those courts permitted a statutory claim under RLUIPA in the face of a defendant's timely

assertion of Eleventh Amendment immunity.  The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law
> or equity, commenced or prosecuted against one of the United States by Citizens of another
> State, or by Citizens or Subjects of any Foreign State.

Although by its terms the Eleventh Amendment applies only to suits against a State by citizens of

another State, Supreme Court decisions have long recognized that the Eleventh Amendment applies

to suits by citizens against their own States.  *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72-73

(2000); *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666,

669-70 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134

U.S. 1, 15 (1890).  "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States

may not be sued by private individuals in federal court."  *Board of Trustees of University of Alabama*

*v. Garrett*,  531 U.S. 356, 363 (2001).

> [F]or over a century now, we have made clear that the Constitution does not provide for
> federal jurisdiction over suits against nonconsenting States. *College Savings Bank v. Florida*
> *Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 669-670, 119 S.Ct. 2219, 144
> L.Ed.2d 605 (1999); *Seminole Tribe*, *supra*, at 54, 116 S.Ct. 1114; *see Hans v. Louisiana*,
> 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

*Kimel v. Florida Bd. of Regents*,  528 U.S. at 73.

RLUIPA represents an exercise of the Spending Power of Congress.  States accepting

money under such congressional enactments are generally bound by the conditions, or "strings" that

Congress attaches.  In the context of Eleventh Amendment immunity, the question is whether a state,

by accepting such funds, has waived its sovereign immunity from suit by implicitly agreeing to a

condition that the state subject itself to suit imposed by Congress.  The Supreme Court requires that

any condition leading to such a waiver be expressed in "unmistakably clear language." *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 65 (1989).  "[T]o be bound by 'federally imposed conditions,'

recipients of federal fundings must accept them 'voluntarily and knowingly.'" *Arlington Cent. Sch.*

*Dist. Bd. of Educ. v. Murphy*, ___ U.S. ___, 126 S. Ct. 2455, 2459 (2006).  Currently there is a

circuit split on the question whether claims for monetary damages under RLUIPA are barred by the

Eleventh Amendment under these principles.  The Fourth Circuit has held that such actions are

barred.  *See Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006); *accord  Scott v. Beard*, No. 06-4439,

2007 WL 3194039, at * 1 (3d Cir. Oct. 30, 2007)( 2007)(RLUIPA claim for monetary damages

against Secretary Beard in his official capacity was "barred by the Eleventh Amendment."); *Webman*

*v. Federal Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006)(finding that sovereign immunity

barred claims for monetary damages under the analogous Religious Freedom Restoration Act

(RFRA))[10]  The Eleventh Circuit is the only circuit that has permitted an official capacity action for

monetary damages over an Eleventh Amendment objection.  *See Smith v. Allen*, 502 F.3d 1255 (11th

Cir. 2007).  The Fourth Circuit's approach in favor of Eleventh Amendment immunity is better

reasoned and is far more consistent with recent Supreme Court precedent.

---

[10]*See also Keen v. Noble*, No. CV F 04-5645, 2007 WL 2789561, (E.D. Cal. Sept. 20,
2007)(RFRA did not waive the United States' sovereign immunity from claims for damages because
the phrase "appropriate relief" was not sufficient to waive sovereign immunity)(collecting cases);
*Bloch v. Thompson*, No. 1:03-cv-1352, 2007 WL 60930, at * 5 (E.D. Tex. Jan. 5, 2007)("RFRA did
not waive the government's sovereign immunity with respect to monetary damages."); *Gee v.*
*Kempthorne*, No. CV 03-432-S-LMB, 2007 WL 317051, at * 2 (D. Idaho Jan. 30, 2007).

The Fourth Circuit determined that the Eleventh Amendment bars a prisoner's RLUIPA claims for monetary damages against the State. *See Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006).[11]  In *Madison*, the court held that the state's acceptance of RLUIPA funds cannot be deemed consent to be sued for damages.[12]  The acceptance of federal funds with conditions attached "in no way implie[d] that a state has consented to each and every remedy to which it could conceivably be subjected." 474 F.3d at 129.  The Fourth Circuit held that the State had only waived Eleventh Amendment immunity as to claims for equitable forms of relief under RLUIPA:

> We begin with the text of the statute. *See, e.g., Arlington [Cent. Sch. Dist. Bd. of Educ. v. Murphy]*, [548 U.S. 291], 126 S.Ct. [2455,] 2459 [(2006)]. Section 4(a) of RLUIPA provides that any person may "assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).  The statute defines "government" to include states, state agencies, and state departments. *Id.* § 2000cc-5.  On its face, RLUIPA thus creates a private cause of action against the State, *Madison* [*v. Riter*], 355 F.3d [310,] 314 [(4th Cir. 2003)], and Virginia cannot be heard to claim that it was unaware of this condition. By voluntarily accepting federal correctional funds, it consented to federal jurisdiction for at least some form of relief. *See Benning* [*v. Georgia*], 391 F.3d [1299,] 1306 [(11th Cir. 2004)] ("[State] was on clear notice that by accepting federal funds for its prisons, [it] waived its immunity from suit under RLUIPA.").  Because "appropriate relief" ordinarily includes injunctive and declaratory relief, *see, e.g., Shea v. County of Rockland*, 810 F.2d 27, 29 (2d Cir.1987), Madison's claims for equitable relief are not barred by the Eleventh Amendment.

*Madison v. Virginia*, 474 F.3d at 130-31.  The Court of Appeals observed that the Supreme Court's decisions in *Lane v. Pena*, 518 U.S. 187 (1996), *United States v. Nordic Village, Inc.*, 503 U.S. 30, 39 (1992), *Library of Congress v. Shaw*, 478 U.S. 310 (1986), and *Atascadero State Hosp. v.*

---

[11]The Fourth Circuit found that RLUIPA was a valid exercise of Congress' Spending Clause powers.  474 F. 3d at 124-28.

[12]The sole issue before the Fourth Circuit was whether the Eleventh Amendment barred a claim for damages against the defendants in their official capacities.  474 F.3d at 130 n. 3.  The Fourth Circuit had no occasion to address whether the statute permitted claims for damages against defendants in their individual capacities.  *Id.*

-34-

*Scanlon*, 473 U.S. 234 (1985), established an analytical framework requiring that the scope of any waiver of sovereign immunity be narrowly construed:

> In analyzing whether a sovereign has waived its immunity, we strictly construe the scope of any alleged waiver in favor of the sovereign. *Lane*, 518 U.S. at 192, 116 S.Ct. 2092. We may "not enlarge the waiver beyond what the language requires." *Shaw*, 478 U.S. at 318, 106 S.Ct. 2957 (internal citations and quotations omitted). Consent to suit is never implied. *See Atascadero*, 473 U.S. at 247, 105 S.Ct. 3142. And ambiguities are construed in favor of immunity. *Nordic Vill.*, 503 U.S. at 34, 112 S.Ct. 1011. In short, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane*, 518 U.S. at 192, 116 S.Ct. 2092; *see also Nordic Vill.*, 503 U.S. at 34, 112 S.Ct. 1011. It is of no moment that some of the cases in this area involve the question of whether Congress has waived federal sovereign immunity, because "[i]n considering whether the Eleventh Amendment applies ... cases involving the sovereign immunity of the Federal Government ... provide guidance." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 506, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998).
>
> The Supreme Court's decision in *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), is telling. At the time the case was decided, Section 106(c) of the Bankruptcy Code provided, "[N]otwithstanding any assertion of sovereign immunity ... a determination by the court of an issue arising under [a provision of the Bankruptcy Code that applies to governmental units] binds governmental units." *Id.* at 32, 112 S.Ct. 1011. The Court held that section 106(c) of the Bankruptcy Code did not waive federal sovereign immunity for monetary relief. Id. at 39, 112 S.Ct. 1011. The Court noted that although section 106(c) waived sovereign immunity for some claims and could be interpreted to provide for money damages, it could also be read to preclude them. *Id.* at 34-37, 112 S.Ct. 1011. As a result, section 106(c) did not contain the "unequivocal textual waiver" required to waive sovereign immunity for monetary relief. *Id.* at 39, 112 S.Ct. 1011.

*Madison v. Virginia*, 474 F.3d at 131. The Fourth Circuit found that "RLUIPA's 'appropriate relief against a government'[13] language fell well short of the unequivocal textual expression necessary to waive State immunity from suits for damages." *Madison*, 474 F.3d at 131. "The statute itself makes no reference to monetary relief -- or even to sovereign immunity generally." *Id.* Like the provision

---

[13] "The starting point in every case involving the construction of a statute is the language itself." *Earnst & Earnst v. Hochfelder*, 425 U.S. 185, 197 (1976). "Appropriate relief" against a State is generally limited to declaratory or injunctive relief against a State employee in his or her official capacity. *Ex Parte Young*, 209 U.S. 123, 160-62 (1908).

in *Nordic Village*, "appropriate relief" was "susceptible to more than one interpretation" and could

be read to include damages in some contexts and not in others.  The Fourth Circuit found compelling

the logic of the recent decision in *Webman v. Federal Bureau of Prisons*, 411 F.3d 1022, 1026 (D.C.

Cir. 2006), holding that an identical "appropriate relief" provision in the Religious Freedom

Restoration Act (RFRA) was insufficient to waive federal sovereign immunity from damages.  474

F.3d at 132 ("[T]he *Webman* court found RFRA's 'appropriate relief against a government' text to

be ambiguous, 'open-ended[,] and equivocal,' it concluded that such language could not effect a

waiver of sovereign immunity.").  If Congress had intended to waive the State's immunity from

claims for monetary damages in exchange for acceptance of federal funds, it had to do more than

resort to RLUIPA's ambiguous phrase, "appropriate relief":

> Had Congress wished to effect a State's waiver of Eleventh Amendment sovereign immunity
> from suit for damages as a consequence of accepting federal funds, it could easily have
> expressed that intention.  In the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(2) (2000),
> for instance, Congress crafted a clear waiver of federal sovereign immunity from monetary
> relief.[14]  The Act provides for federal jurisdiction and permits a "complaining party [to]
> recover compensatory ... damages" from, inter alia, government actors. *Id*.

> While particular phrasing may not be necessary to waive sovereign immunity for damages,
> an unequivocal textual waiver of immunity that "extend[s] unambiguously to such monetary
> claims" is.  *See Lane*, 518 U.S. at 192, 116 S.Ct. 2092.  Thus the fact that "appropriate relief"
> is open-ended forecloses any argument that the statute waives immunity for monetary relief.
> *Nordic Vill.*, 503 U.S. at 37, 112 S.Ct. 1011; *see also Webman*, 441 F.3d at 1026; *Riley*, 106
> F.3d at 566.

*Madison v. Virginia*,  474 F.3d at 132.

   In *Smith v. Allen*, the Eleventh Circuit utilized a different analytical approach.  It first

attempted to determine whether the phrase "appropriate  relief" was broad enough to include

monetary damages, then, as a secondary analytical step, attempted to address the question whether

---

[14]*See also United States v. Georgia*, 546 U.S. 151, 154 (2006); *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 833, 726 (2003).

monetary damages were available in the individual capacity or official capacity contexts. 502 F.3d at 1270-76. I believe that the Eleventh Circuit's approach caused it to come to an erroneous conclusion on the question of whether damages can be recovered under RLUIPA against a state official acting in his or her official capacity. The Eleventh Circuit began its analysis with the Supreme Court's decision in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992). In *Franklin v. Gwinnett*, the Supreme Court observed that its earlier decision in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), had established that "Title IX is enforceable through an implied right of action," but had not decided "what remedies [were] available in a suit brought pursuant to this implied right." 503 U.S. at 65. The Supreme Court made pellucid in *Franklin v. Gwinnett* that it was not engaged in the normal exercise of interpreting statutory terms, but was instead attempting to elaborate the remedies available in the context of an implied cause of action:

> In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court held that Title IX is enforceable through an implied right of action. We have no occasion here to reconsider that decision. Rather, in this case we must decide what remedies are available in a suit brought pursuant to this implied right. As we have often stated, the question of what remedies are available under a statute that provides a private right of action is "analytically distinct" from the issue of whether such a right exists in the first place. *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Thus, although we examine the text and history of a statute to determine whether Congress intended to create a right of action, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. *Davis*,[15] *supra*, 442 U.S., at 246-247, 99 S.Ct., at 2277-2278.

*Franklin v. Gwinnett County Public Schools*, 503 U.S. at 65-66.[16] The above-quoted "presumption" of "all appropriate remedies" applies to the remedies defined by the Supreme Court for an implied

---

[15]*Davis* involved an implied cause of action and the relief available to the plaintiff in the context of an implied cause of action. 442 U.S. at 240-48.

[16]The school district defendant in *Gwinnett* had no possible claim to Eleventh Amendment immunity.

cause of action,[17] and it cannot be properly applied in the statutory construction context where, as here, the defendants have a claim of entitlement to sovereign immunity. A review of the Supreme Court's post-*Franklin v. Gwinnett* decisions reveals that the Supreme Court has very carefully restricted any "presumption" with regard to remedies to implied causes of action and defendants lacking a claim of entitlement to sovereign immunity. *See e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002)("appropriate relief" in an implied cause of action under Title IX does not include a claim for punitive damages); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 639-40 (1999)(implied cause of action under Title IX); *Gebser* 524 U.S. at 284-86; *Lane v. Pena*, 518 U.S. at 196-97 ("Government's sovereign immunity prohibits wholesale application of *Franklin* to actions against the Government to enforce § 504(a)" of the Rehabilitation Act because where a cause of action is authorized against the federal government, the available remedies are not those that are "appropriate" but only those for which sovereign immunity has been *expressly* waived."); *Musick*,

_____

[17] The Supreme Court's decision in *Gebser v. Largo Vista Independent School Dist.*, 524 U.S. 274 (1998), clarified that when the Court is engaged in the speculative task of attempting to define the remedies available under an implied cause of action, the Court is not attempting to determine what Congress meant by the terms it used in a statute. *Id.* at 285. "Because the private cause of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute. That endeavor inherently entails a degree of speculation, since it addresses an issue on which Congress has not specifically spoken." *Id.* at 284 (internal citations omitted). "Because Congress did not expressly create a private cause of action under Title IX, the statutory text does not shed light on Congress' intent with respect to the scope of available remedies. *Franklin*, 503 U.S., at 71, 112 S. Ct., at 1035-1036; *id.* at 76, 112 S. Ct. at 1038 (SCALIA, J. concurring in judgment). Instead, 'we attempt to infer how the [1972] Congress would have addressed the issue had the . . . action been included as an express provision of the' statute." *Gebser*, 524 U.S. at 285 (quoting *Central Bank of Denver v. First interstate Bank of Denver, N.A.*, 511 U.S. 164, 178 (1994)). In this unusual context, the Supreme Court only looks to the statute as a generalized guide in an effort to make sure that the Court's newly-fashioned remedy is not "at odds" with the statutory structure and purpose: "To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose." 524 U.S. at 284.

*Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 291 (1993)("The private right of action

under Rule 10b-5 was implied by the Judiciary" and "[t]hus it would be futile to ask whether the

1934 Congress [] displayed a clear intent to create a contribution right collateral to the remedy.").

       The Eleventh Circuit began its analysis of RLUIPA "on the wrong foot" when it

based a finding that monetary damages are available under RLUIPA by applying the implied cause

of action remedy  "presumption" out of context:

> In light of *Franklin* and its progeny, we agree that the use of the phrase "appropriate relief"
> in section 3 of RLUIPA, 42 U.S.C. § 2000cc(a), is broad enough to encompass the right to
> monetary damages in the event a plaintiff establishes a violation of the statute. Congress
> expressed no intent to the contrary within RLUIPA, even though it could have, by, for
> example, explicitly limiting the remedies set forth in § 2000cc(a) to injunctive relief only.
> Instead, Congress used broad, general language in crafting the remedies section of RLUIPA,
> stating that a prevailing party could obtain "appropriate relief." 42 U.S.C. § 2000cc(a).  We
> assume that, when Congress acted, it was aware of *Franklin's* presumption in favor of
> making all appropriate remedies available to the prevailing party.  *See Franklin*, 503 U.S. at
> 73, 112 S.Ct. at 1036.  In light of that presumption, we conclude that, absent an intent to the
> contrary, the phrase "appropriate relief" in RLUIPA encompasses monetary as well as
> injunctive relief.

*Smith v. Allen*, 502 F.3d 1255, 1270 -1271 (11th Cir. 2007).  The only "progeny" of *Franklin v.*

*Gwinnett* cited by the Eleventh Circuit consisted of a 1992 First Circuit decision: *Reich v.*

*Cambridgeport Air Sys., Inc.*, 26 F.3d at 1187, 1191 (1st Cir. 1994).  *Reich* involved a defendant

with no possible Eleventh Amendment immunity, and there is no evidence suggesting that Congress

was aware of the First Circuit's decision, much less that it drafted RLUIPA with that case in mind.

       By contrast, when Congress enacted RLUIPA, it was certainly aware of a series of

then-recent Supreme Court's decisions:  (1) *Lane v. Pena*'s holding that *Franklin* cannot be applied

wholesale against the government because the only "appropriate" remedies are those for which

sovereign immunity has been *expressly* waived, that ambiguities are resolved in favor of immunity,

and that "To sustain a claim that the Government is liable for awards of monetary damages, the

waiver of sovereign immunity must extend *unambiguously* to such monetary damages," 518 U.S. at 192; (2) *Alden v. Maine*, 527 U.S. 706, 712-13 (1999), emphasizing that reference to the States' immunity from suit as Eleventh Amendment immunity is somewhat of a misnomer, and that the phrase is "convenient shorthand" for "the sovereign immunity of the States [that] neither derives from, nor is limited by, the terms of the Eleventh Amendment" but is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the convention or certain constitutional Amendments;" and (3) *College Savings Bank v. Florida Prepaid Postsecondary Expense Bd.*, 527 U.S. 666, 682 (1999), holding that  the "settled proposition" that "the United States' waiver of sovereign immunity cannot be implied  but must be unequivocally expressed" and that the Supreme Court found "no reason why the rule should be different with respect to state sovereign immunity." A Congress familiar with these three Supreme Court decisions could not have reasonably understood a prisoner's cause of action for "appropriate relief" under 42 U.S.C. §2000cc-2(a) to include a claim for monetary damages against a State or its officials.  Appropriate relief against a government is the type of equitable relief permitted under *Ex Parte Young* -- injunctive relief against a State official in his or her official capacity.  RLUIPA does not contain an unambiguous waiver of the State's sovereign immunity for monetary damages.  An "assumption" that Congress was aware of an inapplicable "presumption" does not and cannot establish an adequate foundation for finding that "appropriate relief" includes a right to recover monetary damages.

In summary, like numerous other courts, I find the Fourth Circuit's reasoning is compelling, *See Gibb v. Crain*, No. 6:04cv81 (E.D. Tex. Mar. 19, 2008); *Bock v. Gold*, No. 1:05-cv-151, 2008 WL 345890, at * 6 (D. Vt. Feb. 7, 2008)("RLUIPA does not create a cause of action for

monetary damages against defendants in their official capacities."); *Toler v. Leopold*, No. 2:05cv82, 2007 WL 2907889, at * 1-2 (E.D. Mo. Oct. 1, 2007); *Dean v. Blum*, No. 406cv3016, 2007 WL 2264615, at * 7 (D. Neb. Aug. 6, 2007); *Nelson v. Miller*, No. 03-254-CJP, 2007 WL 294276, at * 9 (S.D. Ill. Jan. 30, 2007); *Limbaugh v. Thompson*, Nos. 2:93cv1404-WHA, 2:96cv554-WHA, 2006 WL 2642388, at * 6 (M.D. Ala. Sept. 14, 2006); *Boles v. Neet*, 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005)("appropriate relief" under RLUIPA is limited to injunctive and/or declaratory relief against a state governmental entity or official sued in official capacity); *Agrawal v. Briley*, No. 02 C 6807, 2006 WL 3523750, at * 9 (N.D. Ill. Dec. 6, 2006); *Cf Hardaway v. Haggerty*, No. 05-70362, 2007 WL 2868098, at * 4 (E.D. Mich. Aug. 8, 2007). I find that plaintiff's RLUIPA claims for damages against defendants in their official capacities[18] are barred by sovereign immunity.

The determination that official capacity claims for damages are barred by sovereign immunity is unaltered when RLUIPA is viewed as an exercise of Congress' Commerce Clause powers. When it enacted RLUIPA, Congress invoked federal authority "under the Spending and Commerce Clauses." *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). Federal courts have generally examined RLUIPA as an exercise of congressional power under the Spending Clause rather than addressing its RLUIPA's "'purport[ed]' . . . Commerce Clause underpinning." *Smith v. Allen*, 502 F.3d at 1274 (citing 42 U.S.C. § 2000cc-1(b)); *see Cutter v. Wilkinson*, 423 F.3d 579, 590 (6th Cir. 2005)("Because we uphold RLUIPA's validity under the Spending Clause, we have no need to consider whether the statute is also sustainable under the Commerce Clause."); *see also Madison v. Virginia*, 474 F.3d at 127 ("Because we hold that the Spending Clause is a valid and sufficient

---

[18] Plaintiff's official capacity claims for declaratory and injunctive relief under RLUIPA against defendants McLemore, Barry, Gazlay, Pertta, and T. Smith are not barred, under the *Ex Parte Young* exception to Eleventh Amendment immunity and are not moot because plaintiff is an inmate at AMF. These claims are dismissed in section 5.A.4 below.

source of congressional power . . . we need not decide whether RLUIPA exceeds Congress' Commerce Clause power.").

In *Seminole Tribe v. Florida*, the Supreme Court held that Congress lacks the power under the Commerce Clause, or any other provision of Article I, to abrogate the State's sovereign immunity.[19] 517 U.S. at 72-73; *see Garrett*, 531 U.S. at 364 ("Congress may not, of course, base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I."); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 672 (1999)("[T]he power 'to regulate Commerce' conferred by Article I of the Constitution gives Congress no authority to abrogate state sovereign immunity."). "'Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. at 78 (quoting *Seminole Tribe*, 517 U.S. at 72). RLUIPA, when viewed as an exercise of Commerce Clause power, cannot overcome the State of Michigan's sovereign immunity under these authorities.

In summary, I find that plaintiff's RLUIPA claims against defendants in their official capacities for monetary damages are barred by sovereign immunity.

_____

[19] Congress may directly abrogate Eleventh Amendment immunity only when it acts pursuant to section 5 of the Fourteenth Amendment. *See Tennessee v. Lane*, 541 U.S. 509, 517-22 (2004). "[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). "Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." *Garrett*, 531 U.S. at 364. In *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997), the Supreme Court held that RLUIPA's predecessor, the Religious Freedom Restoration Act (RFRA) was invalid as applied to the States and their subdivisions because the Act exceeded Congress' remedial powers under the Fourteenth Amendment. For the same reasons, RLUIPA cannot be considered a valid exercise of Congress' power under section 5 of the Fourteenth Amendment. *See Cutter v. Wilkinson*, 544 U.S. at 715.

4.    **RLUIPA claims for Monetary Damages against Defendants in their Individual Capacities**

A.    RLUIPA is Recognized as a Facially Valid Exercise of Congressional Power Under the Spending Clause

Plaintiff has sued defendants in their individual capacities for damages under RLUIPA.  RLUIPA's section 3 provides that "[a] person may assert a violation of this chapter as a claim . . . in a judicial proceeding and obtain appropriate relief against a government."[20] 42 U.S.C. § 2000cc-2(a).  The question squarely presented is whether "appropriate relief" under this statute enacted by Congress pursuant to its Spending Clause powers includes an action against defendants in their individual capacities for monetary damages.  I find that RLUIPA, as an exercise of Congress' power under the Spending Clause, does not provide a cause of action for damages against defendants in their individual capacities.

The Sixth Circuit, in response to a "facial challenge" to section 3 of RLUIPA, has upheld the statute as a valid exercise of Congress' power under the Spending Clause, Article I, section 8, clause 1 of the Constitution "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States."  *Cutter v. Wilkinson*, 423 F.3d 579, 590 (6th Cir. 2005).  A finding that a statute is facially valid is an extremely narrow judicial determination.  *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (Although section 3 of RLUIPA survived a facial challenge asserting that it violated the Establishment Clause, "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning

---

[20]The term "government" is defined in RLUIPA as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in clause; and (iii) any other person acting under color of State law."  42 U.S.C. § 2000cc-5.

of an institution, the facility would be free to resist the imposition [and] [i]n that event, adjudication in as-applied challenges would be in order."). "Facial challenges are disfavored . . . ." *Washington State Grange v. Washington State Republican Party*, Nos. 06-713, 06-730, __ S. Ct. __, 2008 WL 704368, at * 5 (U.S. Mar. 18, 2008).[21]  A party asserting a facial challenge confronts a "heavy burden" in advancing his claim.  *See National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *see also D.A.B.E., Inc. v. City of Toledo*, 393 F.3d 692, 695 (6th Cir. 2005)("Sustaining such a facial challenge is a 'heavy burden.'")(quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 501 (1987).  A party asserting a facial challenge can only succeed by "establishing that no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all its applications." *Washington State Grange*, 2008 WL 704368, at * 5.  If a facial challenge is upheld, the statute cannot be enforced against anyone.  By contrast, a challenge to a statute as applied is an attack upon the statute's application only to the party before the court.  If the challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable.  *See Ross v. Duggan*, 402 F.3d 575, 583 (6th Cir. 2004); *Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000).  Because a facial challenge to RLUIPA was at issue in *Cutter v. Wilkinson*, the parties challenging the constitutionality of the statute were required to show that "no set of circumstances exists under which the Act would be valid." *Ohio v. Akron Center for Reproductive*

---

[21]"Facial challenges are disfavored for several reasons.  Claims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records.  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 2008 WL 704368, at * 5 (internal quotations and citations omitted).

*Health*, 497 U.S. 502, 514 (1990); *see Stenberg v. Carhart*,  530 U.S. 914, 1019 (2000)*; United*

*States v. Salerno*, 481 U.S. 739, 745 (1987) (for a facial challenge to succeed, there must be no

circumstance in which the statute is constitutional).  Although the Sixth Circuit's holding that section

3 of RLUIPA as a facially valid exercise of Congress' Spending Clause power is narrow in its scope,

the holding has critical consequences for the remedies available to an incarcerated plaintiff asserting

a claim under the statute.

> An exercise of Congress' spending power is in the nature of a contract:

> Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst State Sch. & Hosp. v. Halderman*,  451 U.S. 1, 17 (1981)(internal citations omitted).

RLUIPA's "contractual nature" has critical consequences for scope of remedies available under the

statute.  *See Gebser*, 524 U.S. at 287.  When Congress attaches conditions to the award of federal

funds under its spending power (as it has in Title IX and Title VI), the Supreme Court "examine[s]

closely the propriety of private actions holding the recipient liable in monetary damages for

noncompliance with the condition. Our central concern in that regard is with ensuring that the

receiving entity of federal funds [has] notice that it will be liable for a monetary award." *Gebser*, 524

U.S. at 287 (internal citations and quotation marks omitted).  The individual defendants named in

plaintiff's complaint are not "recipients" of federal funds.  They cannot properly be held liable for

monetary damages under Congress' Spending Clause powers:

> The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power.  *See National Collegiate Athletic Assn. v. Smith*, 525 U.S. 459, 467, n. 5, 119 S.Ct. 924, 929, n. 5, 142 L.Ed.2d 929 (1999) (rejecting suggestion "that the private right of action available under ... § 1681(a) is potentially broader than the Government's enforcement authority").

*Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999); *see*

*National Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999); *see also Smith*, 502 F.3d at

1274.[22]  In light of the Supreme Court and other authorities, it is probable that the Sixth Circuit will

find that there is no statutory claim for monetary damages against individual defendants for monetary

damages under RLUIPA.  I recommend that all plaintiff's claims for damages against defendants in

their individual capacities for monetary damages be dismissed.  Alternatively, for the reasons set

---

[22]     [T]he courts have consistently recognized the limited reach of Congress' Spending Power legislation, concluding that statutes passed under the Spending Clause may, as a condition of funding, subject the grant recipient to liability in a private cause of action, but that the Spending Power cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action. *See, e.g., id.*; *Hartley*, 193 F.3d 1263, 1270 (same); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 654 (5th Cir.1997) (stating that "Title IX does not instruct courts to impose liability based on anything other than the acts of the recipients of federal funds" and finding that "[w]hen the school board accepted federal funds, it agreed not to discriminate on the basis of sex," but that it is "unlikely that it further agreed to suffer liability whenever its employees discriminate on the basis of sex"); *see also Jennings v. Univ. of N.C. at Chapel Hill*, 444 F.3d 255, 268 n. 9 (4th Cir.2006), *rev'd on other grounds*, 482 F.3d 686 (2007) (*en banc*), *pet. for cert. filed*, (U.S. July 9, 2007) (No. 07-43) ("Title IX was enacted pursuant to Congress' spending power and prohibits discriminatory acts by funding recipients.  Because school officials are not funding recipients under Title IX, school officials may not be sued in their individual capacities under Title IX.").  Put simply, the federal circuits are in agreement that Title IX, because of its nature as Spending Power legislation, does not authorize suits against public officials in their individual capacities.

*Smith v. Allen*, 502 F.3d at 1274.

forth in the following section, I find that defendants are entitled to qualified immunity on all plaintiff's RLUIPA claims for damages against defendants in their individual capacities.

### 5.    Qualified Immunity

Plaintiff's amended complaint seeks an award of damages against defendants in their individual capacities under both section 1983 and RLUIPA.  Defendants' motion for summary judgment requests entry of  judgment in defendants' favor on qualified immunity, among other grounds.[23]  "The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006); *see Vakilan v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.  *See Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007); *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Hudson v. Hudson*, 475 F.3d 741, 744  (6th Cir. 2007).  The question whether qualified immunity attaches to an official's actions is a purely legal issue for the court.  *See Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006); *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

---

[23]MDOC, a department of the State of Michigan, does not have an "individual capacity."  It has not requested entry of judgment in its favor on "qualified" immunity grounds.

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001),
emphasized that the defense of qualified immunity must be addressed in proper sequence. The initial
inquiry must be whether the plaintiff has alleged and supported with evidence[24] facts showing that
the defendants' conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see
Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir.
2007); *Silberstein v. City of Dayton*, 440 F.3d at 311; *see also Armstrong v. City of Melvindale*, 432
F.3d 695, 699 (6th Cir. 2006) ("Whether a constitutional violation occurred is a threshold issue: if
the officers' conduct violated no constitutionally protected right, there is no need for further
analysis."); *accord Caudill v. Hollan*, 431 F.3d 900, 908 n.5 (6th Cir. 2005) ("[D]istrict courts . . .
may not assume a constitutional violation or skip to qualified immunity, even when qualified
immunity analysis seems conclusive.").

---

[24]A qualified immunity defense can be asserted at various stages of the litigation, including
the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The
qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6)
stage in that generalized notice pleading no longer suffices, and the broader summary judgment
record provides the framework within which the actions of each individual defendant must be
evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary
judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff
has offered sufficient evidence to indicate that what the official did was objectively unreasonable in
light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d
893, 905 (6th Cir. 2004).

A.     Defendants Are Entitled to Judgment in their Favor as a Matter of Law on Plaintiff's Claims Under Section 1983 and RLUIPA

1.     Eighth Amendment

As a prisoner incarcerated under a criminal conviction, plaintiff's principal substantive rights are guaranteed by the Cruel and Unusual Punishments Clause of the Eighth Amendment.[25] See *Ingraham v. Wright*, 430 U.S. 651, 664 (1977).  The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime.  Punishment may not be "barbarous" nor may it contravene "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  The Eighth Amendment proscribes the wanton and unnecessary infliction of pain and requires the states to provide prisoners with the "minimal civilized measure of life's necessities."  *Id.* at 347.  The function of a federal court in a conditions of confinement case is not how best to operate a detention facility, nor to decide what is most desirable to the inmates.  *Walker v. Mintzes*, 771 F.2d 920 (6th Cir. 1985).  "The Constitution does not mandate comfortable prisons . . . ."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

An Eighth Amendment claim regarding conditions of confinement contains both objective and subjective elements.  *See Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993).  "Extreme deprivations" are required to satisfy the objective component in a conditions-of-confinement case.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  "[A] prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Farmer*, 511 U.S. at 834.  "[R]outine discomfort is part of the penalty that prisoners pay for their

---

[25]The Eighth Amendment's prohibition against cruel and unusual punishment is applicable to the States through the Fourteenth Amendment's Due Process Clause.  *See United States v. Georgia*, 546 U.S. 151, 157 (2006)(citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)(plurality opinion)).

offenses against society." *Hudson*, 503 U.S. at 8.  The objective component requires the court "to assess whether society considers the risk complained of to be so grave that it violates contemporary standards of decency to expose <u>anyone</u> unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 503 U.S. at 36.  Plaintiff has not raised a genuine issue of material fact with regard to the objective element of any Eighth Amendment claim against any defendant.  Plaintiff's dissatisfaction with the food he has received, amount of food provided, type of container the food is served in, and the fact that plastic wrap is removed from Styrofoam meal trays outside plaintiff's presence all fall far short of the objective component of an Eighth Amendment claim.

In general, complaints about the preparation or quality of prison food are "far removed from Eighth Amendment concerns." *Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir. 1977), *later appeal*, 667 F.2d 565 (6th Cir. 1982).  Convicted criminals are not in a position to complain about the mere unpleasantry of prison meals.  *See Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (*per curiam*) ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."); *accord Stapleton v. Wilson*, No. 07-cv-218-KSF, 2007 WL 3120121, *6 (E.D. Ky. Oct. 23, 2007)("The law is not favorable to inmates who complain about the quality of the food served to them.")(collecting cases).  The Eighth Amendment is implicated only when food is insufficient to maintain normal health.  *See Pratt v. Corrections Corp. of Am.*, No. 06-3556, 2008 WL 612571, at * 1 (8th Cir. Mar. 7, 2008).  The food served "need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1455 (9th Cir. 1993).  Even "food [that] occasionally contains foreign objects or is sometimes served cold, while unpleasant, does not amount to a constitutional

deprivation." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985); *accord Smith v. Younger*, No. 98-5482, 1999 WL 623355, at * 2 (6th Cir. Aug. 9, 1999)(citing *Hamm* and affirming the dismissal of prisoner's Eight Amendment conditions of confinement claim "based on the presence of a worm in her peanut butter"); *George v. King*, 837 F.2d 705 (5th Cir. 1988) (dismissing as frivolous under 28 U.S.C. § 1915(d) prisoner's claim based on single incident of unintended food poisoning); *Madyun v. Thompson*, 657 F.2d 868, 874-75 (7th Cir.1981) (allegation that food served to segregated prisoners was cold and not on the menu served to general prison population was insufficient to state an Eighth Amendment violation); *Prophete v. Gilless*, 869 F. Supp. 537 (W.D. Tenn. 1994) (food which was cold by the time it was served did not constitute cruel and unusual punishment).

It is patent that the Eighth Amendment does not require that a prisoner's request for a strict vegetarian diet be honored. *See LaFevers v. Saffle*, 936 F.2d 1117, 1120 (10th Cir. 1991) (affirming dismissal of claim as frivolous under section 1915(d)); *see also Royster v. Riley*, No. 2:06-cv-293, 2008 WL 191309, at * 3 (W.D. Mich. Jan. 22, 2008)("The denial of a religious diet cannot be grounds for an Eighth Amendment claim."). Plaintiff's medical records demonstrate that plaintiff has and is being provided with meals adequate to sustain life and strength. This being so, defendants are entitled to judgment in their favor as a matter of law on plaintiff's Eighth Amendment claims. *See Sims v. Lexington County Detention Ctr.*, No. 3:06-3490-PMD, 2008 WL 216345, at * 4 (D.S.C. Jan. 24, 2001); *see also Johnson v. Kilgore*, No. Civ. A. 7:05-cv-728, 2006 WL 42281, * 4 (W.D. Va. Jan. 6, 2006)(Because "minor weight fluctuations and occasional bouts of diarrhea and vomiting are normal occurrences in life and can be attributed to stress and minor illness," they are insufficient to support an Eight Amendment claim.); *accord White v. Gregory*, 1 F.3d 267, 269 (4th Cir.1993)

(allegations of inadequate food and unsanitary conditions without showing any deleterious effects fails to state a claim under the Eighth Amendment). Furthermore, "A prisoner has no constitutional right to have his meals covered when they are served in his cell." *Murnahan v. Daily*, No. 89-3285-S, 1990 WL 203139, at * 3 (D. Kan. Nov. 28, 1990); *Featherman v. DiGiacinto*, 617 F. Supp. 431, 434 (E.D. Pa. 1985) (holding no constitutional right to have covered food brought to cell). Having no constitutionally guaranteed right to a covered meal, plaintiff has no possible Eighth Amendment claim based on the removal of plastic wrap outside his presence.

Plaintiff likewise falls well short of providing evidence sufficient to create a genuine issue of material fact on the subjective component of his Eighth Amendment claims against defendants. The subjective component requires a showing that the prison official possessed "a sufficiently culpable state of mind." "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. at 837. Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *Miller v. Calhoun County*, 408 F.3d 803, 812-13 (6th Cir. 2005). There is no evidence establishing that any defendant knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff's complaints of deliberate contamination of his food by prison staff have not been substantiated and the medical documents that plaintiff submitted in support of his claims fail to document any adverse health consequences.

-52-

Plaintiff's claim against JMF Dietician Fairbanks is based upon her contact with Dr. Aydar and the doctor's subsequent decision to rescind an order that would have temporarily allowed plaintiff to eat from a vegan diet for roughly fifteen days in 2003. This claim most closely resembles a claim of deliberate indifference to plaintiff's serious medical needs. On the present record, no reasonable trier of fact could find in plaintiff's favor on the subjective or objective components of a claim against defendant Fairbanks for deliberate indifference to plaintiff's serious medical needs. *See Wilson v. Seiter*, 501 U.S. 294 (1991); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2005); *Johnson v. Karnes*, 389 F.3d 868, 874 (6th Cir. 2005). The evidence clearly shows that the doctor's temporary order was not based on any medical necessity.

### 2. First Amendment Free Exercise Clause Claims

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Supreme Court has held that by incorporation through the Fourteenth Amendment, the Free Exercise Clause applies to the States. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). A prisoner retains only those First Amendment freedoms which are "'not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system.'" *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001)(quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *see Turner v. Safley*, 482 U.S. 78 (1987). Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime.[26] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). "The limitations on the

---

[26]Initial issues presented in addressing a Free Exercise Clause claim are whether the plaintiff's beliefs are religious in nature and whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 183-84 (1965). Only beliefs that are religious in nature are

exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell v. Procunier*, 417 U.S. at 822-23.  "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the First Amendment must be evaluated under the test of *Turner v. Safley*.  The Supreme Court noted that it is well established that lawful incarceration legitimately requires restrictions on many rights and privileges as a necessary consequence of a criminal conviction.  *O'Lone*, 482 U.S. at 348.

> [S]uch a standard is necessary "if prison administrators . . ., and not the courts [are] to make the difficult judgments concerning institutional operations."  *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128 [(1977)].  Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration.  The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere

---

protected by the Free Exercise Clause.  *See Thomas v. Review Bd. of the Indian Employment Sec. Div.*, 450 U.S. 707, 713-14 (1981); *Sherbert v. Verner*, 347 U.S. 398 (1963); *see also DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000)("The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections . . . only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection.").  Without doubt, prison officials are entitled to assure themselves of a prisoner's sincerity of religious belief as a prerequisite to their considering a request for an accommodation.  *See Africa v. Pennsylvania*, 662 F.2d 1025, 103 (3d Cir. 1981).  In the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life.  *See Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996).  Defendants have not sought summary judgment on the grounds that plaintiff's beliefs are not religious in nature or that they are not sincerely held.

-54-

> would conclude that it had a less restrictive way of solving the problem at hand.  Courts
> inevitably would become the primary arbiters of what constitutes the best solution to every
> administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal
> courts in the affairs of prison administration."  *Procunier v. Martinez*, 416 U.S. [396], 407
> [(1974)].

*Turner*, 482 U.S. at 89. The familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost to valid penological interests.  *Turner*, 482 U.S. at 89-91.  The *O'Lone* opinion closed with the statement, "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353 (internal citation omitted).

In this instance, there is a valid, rational connection between the prison regulation regarding the handling of requests by prisoners for special diets purportedly based on the prisoner's religious beliefs and the legitimate governmental interests in minimizing the financial and administrative costs of attempting to accommodate prisoners' requests for special diets.  *See e.g.*, *Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003); *Royster*, 2008 WL 191309, at * 6.  After all, there is no need to make any effort to accommodate a purported religious belief that is not sincerely held.  The legitimate governmental interests served by the policy are budgetary and security interests.  "Providing special meals to prisoners is more costly than providing a standard meal.  Some prisoners may make request for a religious meal simply to manipulate a transfer to a different

prison." *Royster*, 2008 WL 191309, at * 6. Prisons need not respond to particularized religious

dietary requests to comply with the First Amendment. *See Kahey v. Jones*, 836 F.2d 948 (5th Cir.

1988). There is a legitimate governmental interest in running a simplified food service rather than

a full-scale restaurant. *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007). Consequently, a

prison may refuse in certain circumstances to provide religious-based diets, even where the prisoners

are sincere in their requests. 486 F.3d at 122. Prison security is not only a legitimate governmental

interest, it is recognized as a compelling governmental interest. *See Hoevenaar v. Lazaroff*, 422 F.3d

366, 368 (6th Cir. 2005); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004).

Serving specialized diets to some inmates and not to others is a potential source of significant

friction. *See Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003).[27] Plaintiff has not disputed

that he retained alternative means for practicing his Neterian faith. The impact that accommodation

of the asserted constitutional right would have on guards and inmates is obvious: it makes an already

dangerous environment even more dangerous and imposes an unwarranted financial burden on the

State of Michigan. There are no other readily available alternatives at a *de minimis* cost to valid

penological interests.

   The State of Michigan expends significant financial and administrative resources in

attempting to accommodate prisoners' religious beliefs by providing them with special diets that do

not offend their sincerely held religious beliefs. The State's resources are finite, while prisoner

---

[27]In *Russell*, the Sixth Circuit held that a prisoner does not possess any protected liberty or property interest in participation in a Kosher Meal Program, that discontinuation of the prisoner's participation in such a program was not an atypical or significant hardship in relation to the ordinary incidents of prison life, and that prison officials were entitled to summary judgment on the prisoner's procedural due-process claims. 79 F. App'x at 178; *see also Treece Burnett*, No. 04-cv-110, 2007 WL 2815020, at * 7 (W.D. Mich. Sept. 25, 2007) (removal of prisoner from Kosher Meal Program "did not constitute the deprivation of a constitutionally protected liberty or property interest").

demands for specialized diets and food preparation are not.  The State of Texas recently found the financial and administrative demands posed by prisoner requests for special religiously-based diets to be overwhelming, and it declined to provide special meals or the equipment necessary for preparing them in favor of simply providing a regular food line, "meat-free tray" or "pork-free tray" alternatives.  The Fifth Circuit, applying the *Turner* test, upheld the Texas policy.[28]  *See Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007).  The court found that there was "a logical connection between the prison policy on inmate diet and the legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id.*  Granting requests for specialized  diets would be expensive, diverting resources from other penological goals.  It would "place undue costs and administrative burdens on the prison system because of the likelihood of proliferation of such requests and the concomitant need to meet multiple distinct dietary requests."[29] *Id.*  Defendants were not required to provide plaintiff with food service in perfect compliance with state policy directives, operating procedures, or plaintiff's religious beliefs.

Defendants' conduct passes muster under the *Turner* test.  I find that defendants are entitled to judgment in their favor as a matter of law on plaintiff's Free Exercise claims.

Plaintiff's amended complaint alleges that defendants Barry, Gazlay, Caldwell, Snyder and T. Smith retaliated against plaintiff for his protected conduct of filing grievances and lawsuits.  (docket # 34, ¶¶ 46, 56, 57).  On summary judgment, a plaintiff asserting a First

_____

[28]The Fifth Circuit also upheld the policy against a RLUIPA challenge, finding the policy to be the least restrictive means of furthering compelling governmental interests. 486 F.3d at 124-26.

[29]*See, e.g.*, *Keesh v. Smith*, No. 9:04-cv-779, 2007 WL 2815641, at * 18 (N.D.N.Y. Sept. 25, 2007)(prisoner Keesh purported to be a member of the "Tulakeesh" faith, asserting that his religious beliefs required him to have fixed diets of certain foods on certain dates, and that his food be prepared by a "Tulakeesh adherent").

Amendment retaliation claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thadeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see also Lustig v. Mondeau*, 211 F. App'x 364, 372 (6th Cir. 2006); *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 438 (6th Cir. 2006). The plaintiff has the burden of proof on all three elements. *See, e.g., Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003). The filing of frivolous grievances and lawsuits is not protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *see also Jackson v. Madery*, 158 F. App'x 656, 660 (6th Cir. 2005); *King v. Zamiara*, 150 F. App'x 485, 493 (6th Cir. 2005); *Jackson v. Kronberg*, 111 F. App'x 815, 818 (6th Cir. 2004). The second component of a retaliation claim is an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in that conduct. The adverseness inquiry is an objective one, and does not depend on how a particular plaintiff reacted. *See Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002); *see also Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003). In *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005), the Sixth Circuit observed that, "As an initial matter, pursuant to this court's *en banc* decision in *Thaddeus-X*, we are required to 'tailor[ ]' our analysis under the 'adverse action' prong to the circumstances of this specific retaliation claim. *Id.* at 398 (requiring specific tailoring and noting that '[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse')." *Mezibov*, 411 F.3d at 721; *see Hix v. Tennessee Dep't of Corrections*, 196 F. App'x 350, 358 (6th Cir. 2006). The Sixth Circuit has cautioned that "§ 1983

is a tort statute, [and] we must be careful to ensure that real injury is involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First Amendment rights was actually deterred." *Mezibov*, 411 F.3d at 721; *see also Talor v. City of Falmouth*. 187 F. App'x 596, 600 (6th Cir. 2006).   Finally, under the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue. The plaintiff must show that the decision was motivated, at least in part, by the plaintiff's protected activity.  *Thaddeus-X*, 175 F.3d at 399; *see Skinner v. Bolden*, 89 F. App'x 579 (6th Cir. 2004) ("[C]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive."). Once the plaintiff has met this burden, if the defendant can show that the same action would have been taken in the absence of protected activity, the defendant is entitled to prevail on summary judgment.  *Thaddeus-X*, 175 F.3d at 399; *see Smith v. Campbell*  250 F.3d 1032, 1038 (6th Cir. 2001).

        Plaintiff alleges that defendant Caldwell retaliated against plaintiff "for writing grievances and suits."  (docket # 34, ¶ 46).  Defendant Burnett made the decisions whether plaintiff was approved to receive a special diet.  Plaintiff obviously blames Caldwell for defendant Burnett's decisions in 2003 and 2004 to deny plaintiff's requests for accommodation of a strict vegetarian diet. (Plf. Brief at 17-18).  The initial interview results could not have been retaliatory, because  plaintiff had not yet filed a grievance or lawsuit regarding the deprivation of same.  Plaintiff has not presented sufficient evidence on which a reasonable trier of fact could find in plaintiff's favor on the causation element regarding the April 2004 interview results.  The Sixth Circuit requires more than mere proximity.  "[T]emporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Arendale v. City of Memphis*, No. 07-5230, ___ F.3d

___, 2008 WL 731226, at * 16 (6th Cir. Mar. 20, 2008).  There is no other compelling evidence or temporal proximity.  Plaintiff had filed his unsuccessful grievance against Caldwell on April 10, 2003, more than a year earlier.  Defendant Caldwell is entitled to judgment in his favor as a matter of law on plaintiff's retaliation claims.

Plaintiff's amended complaint alleges that Resident Unit Manager Terri Smith retaliated against him by approving plaintiff's transfer to MBP, where she knew that plaintiff would not be served a vegan diet.  Resident Unit Managers do not order prisoner transfers.  Plaintiff has presented no admissible evidence indicating that defendant Terri Smith was responsible for his brief transfer to MBP.  Following an annual security classification screen in April 2007, plaintiff was transferred from AMF to MBP.  Within days, plaintiff was transferred back to AMF.  In general, prisoners do not find it objectionable to be transferred to lower security level prisons where they enjoy a less restrictive prison environment.  Moreover, the Supreme Court has repeatedly held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.[30]  *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  No

---

[30]A prisoner does not have a protected liberty interest in the procedures affecting his classification and security, because the resulting restraint does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  Without a protected liberty interest, plaintiff cannot successfully claim that his due-process rights were violated because, "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).  Regardless of whether mandatory language can be located somewhere within a prison policy directive, there is no liberty interest absent an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91(6th Cir.1995)(rejecting Michigan inmate claim that mandatory language of the MDOC's regulations created a liberty interest that he receive notice and hearing before being placed in administrative segregation because placement of the prisoner in administrative segregation did not constitute an atypical and significant hardship within the context of his prison life); *see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997).

reasonable trier of fact could find in plaintiff's favor on any of the elements of a First Amendment retaliation claim against defendant Terri Smith. *See e.g.*, *Barhite v. Michigan Dept. of Corrections*, No. 06-cv-11292, 2007 WL 2647098, *4 (E.D. Mich. Sept. 5, 2007)(a prisoner's filing of a grievance before he was transferred is not sufficient to show that transfer was retaliatory because speculation is no substitute for evidence and plaintiff is required to produce evidence that his filing of a prison grievance was a substantial or motivating factor behind his treatment).

Plaintiff alleges that in January 2007, he was removed from his special diet for approximately two days "in retaliation for filing grievances and protected conduct." (docket # 34, ¶ 57). The amended complaint accused defendants Barry and Gazlay and unserved defendant Snyder. (*Id.*). Plaintiff presented no admissible evidence in support of his purported retaliation claims against defendants Barry and Gazlay. Plaintiff's inadmissible hearsay statement that some unidentified individual told him that Snyder and Barry were responsible for plaintiff's being temporarily removed from his special diet does not suffice. I find that defendants Barry and Gazlay are entitled to judgment in their favor as a matter of law, because no reasonable trier of fact could find in plaintiff's favor on the elements of a First Amendment retaliation claim.

No reasonable trier of fact could find in plaintiff's favor on his purported First Amendment claim against defendant Bulerski arising from her failure to immediately provide the three Neterian books plaintiff had requested while he was housed in administrative segregation at ECF. Plaintiff suffered no prejudice in the lawsuit, and thus has no viable claim for interference with his access to court. Likewise, no reasonable trier of fact could find a First Amendment violation stemming from a failure of warden Renico and Chaplain Caldwell to respond to plaintiff's request that they authorize "B.B.P.D." as a "local" vendor under the policy directive then in effect, when

plaintiff's request itself revealed that the company's corporate address was a Maryland post office box.

### 3. Due Process and Equal Protection Claims

Plaintiff argues that when "[p]laintiff was received at ECF segregation, [] defendant Rick in violation of policies pertaining to property, took and destroyed plaintiff's religious beads, necessary for the practice of plaintiff's religion, without a hearing or proper notice."  (Plf's Brief at 2).  Assuming *arguendo* that the above-quoted statement was true, defendant Rick would be entitled to judgment in his favor as a matter of law on plaintiff's purported due-process claim.  Negligent deprivation of a prisoner's property is not sufficient to support a due-process claim.  *See Carlton v. Jondreau*, 76 F. App'x 642, 643 (6th Cir. 2003)("No due process claim is stated for the negligent deprivation of property."); *Garrison v. Walters*, 18 F. App'x 329, 332 (6th Cir. 2001).  Moreover, a state prisoner asserting a procedural due-process claim arising from a random and unauthorized act of a state officer must first plead and prove the absence of an adequate state remedy.  *See Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *see also Morris v. Cason*, 102 F. App'x 902, 903 (6th Cir. 2004); *Scott v. Norton*, 96 F. App'x 378, 380 (6th Cir. 2004).  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law."  *Parratt*, 451 U.S. at 537.  This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  The Sixth Circuit recognizes that Michigan's available post-deprivation remedies are more than adequate to compensate plaintiff for any loss of personal

property suffered as a result of defendant Rick's alleged actions.[31]  *See Copeland v. Machulis*, 57

F.3d at 479; *see also Carlton v. Jondreau*, 76 F. App'x at 643.  Defendant Rick is entitled to

judgment in his favor as a matter of law on plaintiff's federal claims.

Plaintiff claims that defendants violated his rights under the Equal Protection Clause.

"The Equal Protection Clause commands that no State shall 'deny to any person within its

jurisdiction the equal protection of the laws.' This provision creates no substantive rights." *Vacco*

*v. Quill*, 521 U.S. 793, 799 (1997)(quoting *San Antonio Independent School Dist. v. Rodriguez*, 411

U.S. 1, 33 (Stewart, J., concurring)).  "Instead, it embodies a general rule that States must treat like

cases alike but may treat unlike cases accordingly." *Vacco*, 521 U.S. at 799 (quoting *Plyler v. Doe*,

457 U.S. 202, 216 (1982) ("[T]he Constitution does not require things which are different in fact or

opinion to be treated in law as though they were the same.").

> The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  As we have explained, "to withstand Fourteenth Amendment scrutiny, statutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest." *Jackson v. Jamrog*, 411 F.3d 615, 618 (6th Cir.2005) (quoting *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir.2002)). The district court concluded properly that plaintiffs are not members of a suspect class and that they do not allege a violation of a fundamental right. "Without question, prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson*, 411 F.3d at 619; *see also Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir.1998).

------

[31]"Numerous state post-deprivation remedies were available to [plaintiff].  First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. Mich. Dep't of Corr., Policy Directive 04.07.112, ¶ B (effective Nov. 15, 2004). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. Mich. Comp. Laws § 600.6419; Policy Directive, 04.07.112, ¶ B. Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims against the state and any of its departments, commissions, boards, institutions, arms, or agencies. Mich. Comp. Laws § 600.6419(1)(a)." *Hall v. Caruso*, No. 1:07-cv-1162, 2008 WL 397601, *2 (W.D. Mich. Feb. 11, 2008).

*Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007).  Prisoners are not a suspect class.  *Id.*; *see*

*Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir.1997).  Plaintiff argues that he has been deprived

of a "fundamental right" to a religious diet such that a strict scrutiny standard should apply.  (Plf's

Brief at 21).  As previously shown, the Eighth and First Amendments do not guarantee plaintiff a

"religious diet" at State expense.  To recognize such a broadly-asserted right as being "fundamental"

under the Equal Protection Clause would reduce Michigan's prisons to little more than a catering

service for inmates at public expense.  However, even assuming *arguendo* that the more demanding

strict scrutiny applied, Michigan's policy requiring inmates to participate in an interview regarding

their purportedly religious-based dietary needs is "suitably tailored to serve a compelling state

interest."  *Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005).  It serves the compelling state

interests of conserving State's resources, both in terms of the monetary expense and expenditure of

human resources associated with providing specialized diets to persons serving criminal sentences

in an institutional setting.  Having determined that the policy passes scrutiny under the more rigorous

standard, it easily withstands scrutiny under the rational basis test.[32]  *See  Romer v. Evans*, 517 U.S.

620, 631 (1996).

      Plaintiff objects that defendant Burnett approved a Buddhist inmate's request for a

special diet in 2004 and that Burnett did not approve plaintiff's request for a special diet until 2005.

---

[32]"Under rational basis scrutiny, government action amounts to a constitutional violation only
if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can
only conclude that the government's actions were irrational.  The plaintiff[] bear[s] the burden of
demonstrating that the government lacks a rational basis, and [he] may satisfy this burden either by
negating every conceivable basis which might support the government action, or by demonstrating
that the challenged government action was motivated by animus or ill-will.  The State, conversely,
bears no burden of proof; its legislative choice is presumptively valid and may be based on rational
speculation unsupported by evidence or empirical data."  *Michael v. Ghee*, 498 F.3d at 379 (citations
and internal quotations omitted).

Plaintiff was not similarly situated.  Unlike Buddhist inmate McKinney, plaintiff was unwilling to answer the questions during his interview, as required.  The Equal Protection Clause, at its heart, requires that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439  (1985); *see Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  No reasonable trier of fact could find an Equal Protection Clause violation on this record.

4.   RLUIPA Claims

The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a).   "The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion.  The burden of proving the existence of a substantial burden rests on the religious adherent." *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007); *see Living Water Church of God v. Charter Twp. of Meridian*, Nos. 05-2309, 06-1210, __ F. 3d __, 2007 WL 4322157, at * 4 (6th Cir. Dec. 10, 2007); *see also Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002) ("RLUIPA . . . requires the complainant to show that his religious exercise was substantially burdened.").

RLUIPA does not define the phrase "substantial burden," and the Supreme Court "has not yet defined 'substantial burden' as it applies to RLUIPA."  *Living Water*, 2007 WL 4322157, at * 5.  In *Living Water*, the Sixth Circuit declined to establish a "bright line test" for determining a "substantial burden."   *Id.* at 8.  It held that the Supreme Court's Free Exercise jurisprudence

-65-

provides the appropriate analytical framework. *Id.* at 12.  The Sixth Circuit emphasized that in the Free Exercise context, the Supreme Court has made clear that the "substantial burden' hurdle is high." *Id.* at 5.  "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 7.  "'[A] substantial burden must place more than an inconvenience on religious exercise.'" *Id.* at 10 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).  A substantial burden is not established because the government's action makes the religious exercise more difficult or expensive. *Living Water*, 2007 WL 4322157, at * 10; *see Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813-14 (8th Cir. 2008)(Muslim inmate's claims that the dietary accommodations offered by the BOP were inadequate under RLUIPA because the prisoner found it necessary to purchase *halal* items from the prison's commissary failed to establish a "substantial burden" under RLUIPA).  It is not necessary to repeat the analysis of plaintiff's First Amendment claims.  Plaintiff has not presented evidence that he lacked alternative means to practice his Neterian faith.[33]  Accommodation of the rights plaintiff claims would cause a significant financial burden and increase the risk of prison violence.  *See Treece v. Burnett*, 2007 WL 2815020, at * 6; *accord Andreola v. Wisconsin* 211 F. App'x 495, 499 (7th Cir. 2006) (district court correctly determined that under RLUIPA defendants were not required to spend an additional $2000 to provide prisoner with pre-packaged kosher meals and "defendants ha[d] a legitimate interest in abating the costs of a prisoner's keep.").  Plaintiff has not offered any alternative that would fully accommodate his asserted rights at a *de minimis* cost to the legitimate state interests that gave rise to the restrictions.  I find that no

---

[33] There is no need for an extended discussion of plaintiff's claims for injunctive relief against defendants in their official capacities.  Defendants Palmer and Stoley lacked authority to establish MDOC recognition of Satanism as a religion and could not allow plaintiff to possess books on the MDOC's restricted publications list.  Director Caruso has the requisite authority (*see* Caruso Aff., ¶ 7), but there is no underlying RLUIPA violation supporting relief against defendant Caruso in her official capacity.

reasonable trier of fact could find in plaintiff's favor on the "substantial burden" component of his RLUIPA claims against defendants.

Furthermore, even if plaintiff had presented evidence showing a "substantial burden" on his religious exercise of his Neterian faith, defendants have presented evidence establishing that the actions taken were the least restrictive means of furthering compelling governmental interests. The Supreme Court's *Cutter v. Wilkinson* decision provided guidance to lower courts regarding the application of RLUIPA's statutory standards:

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests. In *[Estate of Thornton v.] Caldor, [Inc.*, 472 U.S. 703 (1985)], the Court struck down a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S., at 709, 105 S. Ct. 2914. We held the law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests." *Id.*, at 710, 105 S. Ct. 2914.
>
> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, *see supra*, at 2118, "[c]ontext matters" in the application of that standard. *See Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325, 156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. *See, e.g.*, 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

544 U.S. at 722-23. "[P]rison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at 725 n.13; *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005) ("In conducting an analysis of whether the regulation in issue was the least restrictive means of furthering the government's compelling security interest, the district court did just what the Supreme Court and Congress have warned against: substituting its judgment in place

of the experience and expertise of prison officials."); *see also Gronquist v. Williams*, No. C06-5543

RBL/KLS, 2008 WL 678658, at * 8 (W.D. Wash. Mar. 7, 2008).  The policy requiring that prisoners

participate in an interview and explain why their beliefs warrant accommodation is the least

restrictive means of accommodating the religious beliefs of prisoners while at the same time dealing

with the serious and substantial problem of prisoners attempting to manipulate the system in efforts

to obtain special privileges or conduct gang-related activities under the guise of religious exercise.

*See e.g.*, *Cutter v. Wilkinson*, 544 U.S. at 723 n.11 (2005)("Courts . . . may be expected to recognize

the government's countervailing compelling interest in not facilitating inflammatory racist activity

that could imperil prison security and order.").

In summary, all of plaintiff's claims under RLUIPA fail for want of a showing that

any defendant imposed a substantial burden on the exercise of plaintiff's rights.

### B.   Defendants Are Entitled to Qualified Immunity

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement

under *Saucier*, plaintiff would nonetheless fall short of showing that the rights he claims each

individual defendant violated were "clearly established" such that a reasonable official in the

defendant's position, at the time the act was committed, would have understood that his or her

behavior violated that right.  533 U.S. at 201.  The Supreme Court's decision in *Brosseau v. Haugen*,

543 U.S. 194 (2004), examined the underlying purpose of requiring that the law be clearly

established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if
> constitutionally deficient, misapprehends the law governing the circumstances she
> confronted.  . .  Because the focus is on whether the officer had fair notice that her conduct
> was unlawful, reasonableness is judged against the backdrop of the law at the time of the
> conduct.  If the law at the time did not clearly establish that the officer's conduct would

violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein*, 440 F.3d at 316. "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'"[34] *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir. 2001). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201); *see Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). Although it is not always necessary to find a case where identical

---

[34]The question is whether the right was clearly established in a particularized sense at the time the defendant acted. It is not whether unresolved questions exist as to a statute's constitutionality. *Compare Figel v. Overton*, No. 06-2199, 2008 WL 341458, at * 2 (6th Cir. Feb. 6, 2008)(rejecting the defendants' blunderbuss argument that because the Supreme Court did not issue its decision rejecting a facial challenge to section 3 of RLUIPA under the Establishment Clause in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), until May 31, 2005, that the law could not be clearly established with regard to defendants' obligations until after that date).

conduct had previously been determined to be unconstitutional,[35] in light of preexisting law, the unlawfulness must be apparent.  *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Risbridger*, 273 F.3d at 569.  "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary."  *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005).  The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit.  *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)).  "If reasonable officials could disagree on the issue, immunity should be recognized."  *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042.  "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances."  *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964.  "The burden of

---

[35]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law."  *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179

F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at

427.

        Plaintiff has not shown that the actions of defendants Caldwell and Burnett with

regard to the denial of plaintiff's 2003 and 2004 requests for accommodation of a strict vegetarian

diet violated his rights under either the First Amendment or RLUIPA. Plaintiff argues that wardens

Renico and Burt "were required to ensure compliance with policies and defendants Black, Dutcher,

and S. Smith had an obligation to follow policy, despite Burnett's denial of the vegan diet, plaintiff

requested accommodation with valid policy which they refused to comply with, and chose to enforce

the orders of Burnett." (Plf's Brief at 13). A violation of a prison policy, assuming one had

occurred, is not the same thing as a violation of a clearly established federal constitutional or

statutory right. Moreover, it is patent that these individuals were not violating applicable policy.

It was plaintiff who was attempting to bypass the policy directive restricting how frequently a

Michigan prisoner can request to eat from a special diet on the basis of his religious beliefs. Plaintiff

argues that when defendant Bulerski did not immediately provide him with the Neterian books

plaintiff had requested, her actions were "in violation of policy." (Plf's Brief at 14). This does not

suffice to defeat Bulerski's qualified immunity for the reasons stated above. The same is true for

plaintiff's argument that defendants Barry and Gazlay "had no authority to cancel plaintiff's religious

meals" and plaintiff's general claim that "defendants violated their own policies." (Plf's Brief at 15,

17). Plaintiff's brief contains a bare assertion that Terri Smith was aware that plaintiff was being

transferred and had reviewed his file for transfer. (*Id.*). Such assertions in a brief are not a substitute

for evidence, and plaintiff has not cited any authority clearly establishing that either of these

purported actions by Terri Smith would have violated any of plaintiff's clearly established federal rights. Plaintiff argues that defendants Barry and Gazlay failed to ensure that plaintiff's meals "were in compliance with plaintiff's religious dietary restrictions," citing deficiencies in pita bread and mashed potatoes that were the subject of his grievances. At best, this is a claim that these defendants were negligent in failing to more closely monitor the ingredients of two items served during the years plaintiff has been receiving strict vegetarian meals. Suffice it to say that defendants' actions did not violate any of plaintiff's clearly established rights under the Constitution or RLUIPA. Plaintiff has not presented any authority remotely establishing that a dietician's contacting a physician about a prisoner's meal plan constitutes a violation of clearly established Eighth Amendment rights. I find that defendant Fairbanks is entitled to qualified immunity. Plaintiff has cited no authority, much less clearly established law, that would require that plastic wrap be removed from his meals only in his presence or that would preclude prison officials from satisfying themselves that the containers were not being used to transport contraband. Plaintiff makes a generalized assertion that the Fourteenth Amendment's Due Process Clause generally prohibits the taking of property without due process of law.[36] (Plf's Brief at 18). In the qualified immunity context, a more particularized showing is required, *see Lyons*, 417 F.3d at 572, and plaintiff has not shown that defendant Rick's actions violated any clearly established federal right. In summary, I find that defendants are entitled to summary judgment on plaintiff's claims against them in their individual capacities for monetary damages on the alternative basis of qualified immunity.

---

[36]The Fifth Amendment restricts the actions of the federal government. *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 n.3 (6th Cir. 2007). There are no federal defendants in this lawsuit. The references to the Fifth Amendment in plaintiff's brief have been ignored.

C.    Supplemental Jurisdiction

Plaintiff asks the court to exercise jurisdiction over purported state-law claims. "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003). Generally, where all federal claims have been dismissed, federal courts decline to exercise supplemental jurisdiction over a plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F. 3d 840, 853 (6th Cir. 2007); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *Widgren v. Maple Grove Township*, 429 F.3d 575, 586 (6th Cir. 2005). There is no reason in this case to depart from the general rule. I recommend that the court, in its discretion, decline to exercise supplemental jurisdiction.

D.    Claims Against Defendants Snyder and Jones

Defendants Snyder and Jones have never been served with process. Plaintiff avoided screening of his purported claims against these individuals when the case was filed in the Eastern District and subsequently transferred here. In determining whether plaintiff's complaint fails to state a claim, the court is limited to plaintiff's first amended complaint rather than the broader summary judgment record. However, plaintiff elected to support his amended complaint with exhibits. The exhibits have been considered pursuant to Rule 10(c) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 10(c); *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 603-04 (6th Cir. 2005); *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) ("'In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'") (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554

(6th Cir. 1997)); *see also Never Tell Farm, LLC v. Airdrie Stud, Inc.*, 123 F. App'x 194, 197 (6th Cir. 2005).

           Plaintiff's allegations in support of a federal claim against defendant Jones are found in paragraphs 7, 19, 23, 50, and the allegations against Snyder appear in paragraphs 10, 43 and 57. Plaintiff's allegations of legal conclusions do not suffice to state a claim. *See Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005); *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003). Plaintiff alleges that he was denied a special diet meal for his dinner on January 29, 2007. Plaintiff alleges that earlier that day he had written to Chaplain Snyder "explaining the Neterian beliefs, in advance of other inmates plaintiff ha[d] been teaching requesting the vegan diet for religious reasons" and plaintiff asserts that he met with Snyder to "explain[] his reason for the letter." (docket # 34, ¶ 43). Plaintiff filed a grievance the next day, claiming that an unidentified individual told him that Snyder had canceled his special meal. The Step I grievance response indicated that there had been a miscommunication regarding food service, and that as soon as it was brought to Snyder's attention the error had been immediately corrected and plaintiff's vegan meals continued. Plaintiff did not contest that his special diet had quickly been restored, but claimed that he had been forced to miss a meal in "retaliation for engaging in [unspecified] protected conduct." (*Id.*). Plaintiff's grievance asserted that the brief interruption of his special diet came in retaliation for his "numerous" grievances and two of the lawsuits he had filed in the United States District Court for the Eastern District of Michigan: case numbers 04-cv-74765-DT and 2:06-cv-14985. Snyder was not a named defendant in case number 2:04-cv-74765-DT, which had been dismissed on March 16, 2006, nearly a year earlier. Plaintiff named Snyder as a defendant in his first amended complaint filed in the Eastern District on May 3, 2007, and Snyder has never been served. This could not have been the

-74-

basis for allegedly retaliatory action taken by Snyder in January of 2007. Plaintiff's purported "retaliation" claim against Snyder fails to state a claim upon which relief may be granted. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see also Lustig v. Mondeau*, No. 05-1905, 2006 WL 3253496, at * 7 (6th Cir. Nov. 8, 2006).

Plaintiff's purported federal claims against Warden Jones likewise require little discussion. Warden Jones did not serve plaintiff his meals during plaintiff's confinement at DRF from April 24, 2003 through July 23, 2003. The warden had no authority to provide plaintiff with a strict vegetarian diet, when plaintiff's request had been denied by defendant Burnett in Lansing. Plaintiff's purported Eighth Amendment claim against Jones regarding the nutritional adequacy of the food plaintiff received at DRF was completely undermined by the medical records plaintiff attached as exhibits in support of his amended complaint. Warden Jones certainly cannot be held liable for "holding" plaintiff as a prisoner at DRF. Plaintiff was serving and he continues to serve prison sentences imposed on plaintiff's two felony convictions of third degree criminal sexual conduct.

In summary, I recommend that plaintiff's purported federal claims against Snyder and Jones be dismissed pursuant to 28 U.S.C. § 1915A for failure to state a claim.

## **Recommended Disposition**

For the foregoing reasons, I recommend that plaintiff's motion for summary judgment (docket # 54) be denied. I further recommend that the motion for summary judgment by defendants Michigan Department of Corrections, Caldwell, Fairbanks, Caruso, Burnett, McLemore, Renico, S. Smith, Dutcher, Burt, Bulerski, Rick, Barry, Gazlay, Perttu, Black and T. Smith (docket # 2) be granted and that judgment be entered in their favor on all plaintiff's federal claims, with the

exception of plaintiff's claims against defendant Burnett requesting that plaintiff be allowed to possess four items of personal property (a necklace of chant/meditation beads, and ankh symbol, incense, and a meditation rug, mat, or blanket) which should be dismissed without prejudice on ripeness grounds.  I further recommend that plaintiff's claims against unserved defendants Jones and Snyder be dismissed pursuant to 28 U.S.C. § 1915A for failure to state a claim.  Finally, I recommend that the court, in its discretion, decline to exercise supplemental jurisdiction over any of plaintiff's purported state-law claims.


Dated:  March 31, 2008            /s/  Joseph G. Scoville_____
                                  United States Magistrate Judge

## NOTICE TO PARTIES

        Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).